COAL EXPORTERS ASSOCIATION OF the UNITED STATES, INC. and National Coal Association, Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Norfolk & Western Railway Company et al., Coastal States Energy Company, Atchison, Topeka & Santa Fe Railway Company et al., Nippon Steel Corporation et al., and Patrick W. Simmons, Intervenors.

EASTERN COAL TRANSPORTATION CONFERENCE, Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

Norfolk & Western Railway Company et al., Coastal States Energy Company, and Patrick W. Simmons, Intervenors.

Nos. 83–1629, 83–1633.

United States Court of Appeals, District of Columbia Circuit.

Argued March 14, 1984.

Decided Sept. 18, 1984.

As Amended Sept. 18 and Oct. 1, 1984.

John Louis Oberdorfer, Washington, D.C., with whom Scott N. Stone, Robert Stauffer, and Garret G. Rasmussen, Washington, D.C., were on the brief, for petitioners Coal Exporters Ass'n of U.S., Inc. and Nat. Coal Ass'n in No. 83–1629.

C. Michael Loftus, Washington, D.C., with whom David A. Sutherland, Washington, D.C., was on the brief, for petitioner Eastern Coal Transp. Conference in No. 83–1633 and intervenor Coastal States Energy Co. in Nos. 83–1629 and 83–1633.

H. Glenn Scammel, Atty., I.C.C., Washington, D.C., with whom John Broadley, Gen. Counsel, and Lawrence H. Richmond, Deputy Associate Gen. Counsel, I.C.C., Washington, D.C., and John J. Powers, III and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., entered an appearance for respondent U.S.A.

Robert Eden Martin, Chicago, Ill., with whom G. Paul Moates and Vincent F. Prada, Washington, D.C., Richard W. Kienle, Roanoke, Va., Roland W. Donnem, Cleveland, Ohio, Richard B. Allen and Renee D. Rysdahl, Washington, D.C., and Emried D. Cole, Jr., Jacksonville, Fla., were on the brief, for intervenors Norfolk & Western Ry. Co. et al. in Nos. 83–1629 and 83–1633.

Richard A. Hollander, Jacksonville, Fla., entered an appearance for intervenors Norfolk & Western Ry. Co. et al. in No. 83–1629.

Gordon P. MacDougall, Washington, D.C., was on the brief for intervenor Patrick W. Simmons in Nos. 83–1629 and 83–1633.

Noel Hemmendinger, Washington, D.C., was on the brief for intervenors Nippon Steel Corp. et al. in No. 83–1629.

Milton E. Nelson, Jr. and Richard E. Weicher, Chicago, Ill., Kendall T. Sanford, Denver, Colo., Thormund A. Miller and Louis P. Warchot, San Francisco, Cal., Stuart E. Vaughn, Chicago, Ill., J. Thomas Greene, Salt Lake City, Utah, and Frederick W. Read, III, Omaha, Neb., were on the brief for intervenors Atchison, Topeka & Santa Fe Ry. Co. et al. in No. 83–1629.

Robert B. Batchelder, Omaha, Neb., entered an appearance for intervenors Atchison, Topeka & Santa Fe Ry. Co. et al.

Before WRIGHT, TAMM, and MIKVA, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge.

In this case we review a decision of the Interstate Commerce Commission to exempt all rail transportation of coal destined for export through United States ports from all provisions of the Interstate Commerce Act (ICA), as amended.[1] Here, challenges are brought to the exemption decision by organizations of coal producers and other export coal shippers.

This case began when, on March 30, 1981, the Norfolk & Western Railway Company, a major carrier of export coal, filed a petition with the ICC under the exemption provision of the Staggers Rail Act of 1980, 49 U.S.C. § 10505 (1982).[2] The petition sought an exemption from regulation for all export coal traffic moving by rail through Atlantic and Gulf ports. In September 1981 ICC issued a notice of proposed exemption in which it requested comments on partial or complete exemption of export coal traffic moving through all United States ports. *Notice of Proposed Exemption, Railroad Exemption—Export Coal*, 46 Fed.Reg. 44529 (September 4, 1981), Joint Appendix (JA) 173. A large number of comments were received, including comments from a number of federal government entities. Railroads uniformly favored an exemption, and their position was supported by the United States Department of Transportation. Mine owners and other shippers opposed the exemption, as did a number of river carrier, port, and ocean carrier interests, the Departments of State and Commerce, the ICC's Office of Special Counsel, and the United States Trade Representative. The Department of Justice took no position except to state that any such exemption must end antitrust immunity for exempted transportation. *Ex Parte No. 346 (Sub-No. 7), Railroad Exemption—Export Coal*, 367 ICC 570, 571 (1983) (hereinafter cited as *Decision* ).

On March 3 and 4, 1983 the Commission announced its decision to exempt export coal and advised that an opinion explaining the decision was being prepared. On June 9, 1983 the decision was issued. *See* note 1 *supra*. ICC Chairman Taylor filed a dissenting opinion.

This case again focuses this court on the exemption provision of the Staggers Act,

---

1. The provisions of the Interstate Commerce Act, as amended, may be found at 49 U.S.C. Subtitle IV (1982). For the Interstate Commerce Commission's decision, *see Ex Parte No. 346 (Sub-No. 7), Railroad Exemption—Export Coal*, 367 ICC 570 (1983) (hereinafter cited as *Decision* ).

2. Pub.L. No. 96–448, Title II, § 213, 94 Stat. 1912 (1980).

49 U.S.C. § 10505 (1982), *see Brae Corp. v. United States*, 740 F.2d 1023 (D.C.Cir.1984) (reviewing ICC exemption of boxcar transportation); *see also Simmons v. ICC*, 697 F.2d 326 (D.C.Cir.1982); *McGuinness v. ICC*, 662 F.2d 853 (D.C.Cir.1981).[3] In particular, this case requires that we examine two closely related ICC findings, each of which is required by Section 10505 as a precondition to ICC's exercise of exemption authority. The first finding was that the regulation lifted in this exemption was "not necessary to carry out the [national rail] transportation policy of [49 U.S.C.] section 10101a[.]" 49 U.S.C. § 10505(a)(1) (1982). The second finding was that the regulation was "not needed to protect shippers from the abuse of market power." *See id.* § 10505(a)(2)(B). The two findings are particularly intertwined in this case because petitioners, as shippers, most emphasize an element of national rail transportation policy that assures the maintenance of "reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital[.]" *Id.* § 10101a(6). Obviously, the policy reflected in that element substantially overlaps with the provision relating to "protect[ing] shippers from the abuse of market power." Because the ICC's conclusions with respect to these le-

**3.** The exemption provision, in relevant part, reads:

In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—

(1) is not necessary to carry out the transportation policy of section 10101a of this title; and

(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

49 U.S.C. § 10505(a) (1982). In this case the Commission made no finding with respect to the issue of "limited scope," relying instead on its finding relating to "abuse of market power." *See Decision, supra* note 1, 367 ICC at 586 n. 37.

Section 10101a, referred to in the exemption provision, reads:

In regulating the railroad industry, it is the policy of the United States Government—

(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

(2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;

(3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission;

(4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;

(5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;

(6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;

(7) to reduce regulatory barriers to entry into and exit from the industry;

(8) to operate transportation facilities and equipment without detriment to the public health and safety;

(9) to cooperate with the States on transportation matters to assure that intrastate regulatory jurisdiction is exercised in accordance with the standards established in this subtitle;

(10) to encourage honest and efficient management of railroads and, in particular, the elimination of noncompensatory rates for rail transportation;

(11) to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability;

(12) to encourage fair wages and safe and suitable working conditions in the railroad industry;

(13) to prohibit predatory pricing and practices, to avoid undue concentrations of market power and to prohibit unlawful discrimination;

(14) to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information; and

(15) to encourage and promote energy conservation.

49 U.S.C. § 10101a (1982).

gal standards reflect an unreasonable interpretation of their meaning, we must vacate and remand the exemption decision.[4]

Two interrelated challenges of petitioners will be discussed in this opinion. First, petitioners challenge the decision on the basis that the reasoning the ICC used to analyze the record before it and justify its action in relation to that record was arbitrary and capricious in violation of Section 10 of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982). Second, petitioners argue that the ICC's interpretation of the Staggers Act's exemption authority, as reflected in the reasoning of the ICC's opinion, is an unreasonable one in relation to the statute's wording and legislative history. The latter argument focuses on the

meaning of the provisions protective of shipper interests, particularly 49 U.S.C. §§ 10101a(6) and 10505(a)(2)(B) (1982). Our analysis turns more on this latter contention, but the two arguments are closely interrelated.

## I. A GENERAL OVERVIEW OF THE STAGGERS RAIL ACT

Before analyzing the reasoning of the ICC and the challenges to the decision, it is useful to review the decision's statutory basis. The Staggers Rail Act of 1980 was a complex and comprehensive amendment to the ICA. The primary goal of the Act was to revitalize the railroad industry by reducing or eliminating regulatory bur-

---

4. Petitioners have also argued that ICC's exemption decision must be vacated for failure to comply with a variety of procedural requirements of the Administrative Procedure Act and other laws. Because of our disposition of the case on other grounds, we need reach no conclusions regarding the merits of most of these challenges. One of these challenges, however, we shall examine.

Petitioners contend that Commissioner Gradison, who voted in the exemption decision, was obliged to disqualify herself because her impartiality in this proceeding "might reasonably be questioned." 28 U.S.C. § 455(a) (1982). Because Commissioner Gradison may choose to participate in future proceedings concerning the matters raised in this case, we will discuss the contention that she should have disqualified herself in this proceeding.

Petitioners argued below that the Commission's Canon of Conduct, 49 C.F.R. § 1000.735-14(a) (1983), obliged Commissioner Gradison to disqualify herself in this case. In relevant part that canon states: "Members * * * shall not participate in any matter in which they have a substantial pecuniary interest or in which their impartiality might reasonably be questioned." Petitioners do not contend that Commissioner Gradison had any pecuniary interest in the outcome of this case. But they do contend that her impartiality "might reasonably be questioned." They point out that earlier in her career she had been an employee of the Southern Railway Company for eight years. Petitioners also point out that subsequent to Gradison's resignation from Southern it merged with the Norfolk & Western Railway Company, which was the original proponent of the exemption at issue in this case. Commissioner Gradison denied petitioners' motion for disqualification and filed a detailed explanation of her reasoning. Joint Appendix (JA) 177–195.

We reject petitioners' contention that it was improper for Commissioner Gradison to have denied the motion for her disqualification. Petitioners contend that "her duties [at Southern] included developing a rate structure for deregulated fresh fruits and vegetables with a view in part to gain experience should other areas of traffic be exempted." Reply brief of petitioners Coal Exporters Association of the United States, Inc. and National Coal Association (CEA/NCA) at 25 n. 49. But even if this were so, such an employment record in itself implies no impropriety in her fully participating in exemption cases such as this. No contention is made that her prior employment experience is significant for reasons other than that it involved the Commissioner in a presumably partisan way in the general issues of rail carrier deregulation. Yet even on this issue no specific evidence of a closed mind is given. It is not surprising that a member of ICC has had substantial employment experience with a rail carrier. Nor is it surprising that ICC's rulemaking proceedings may involve policies that affect many rail carriers. The fact that a Commissioner had in the past done work for a carrier that has involved that person in the general areas of policy that surround a rulemaking cannot be sufficient to prevent that Commissioner's participation in that rulemaking. A Commissioner is not required to repudiate her past experiences upon assuming public office. Prior involvement in the general public issues facing an agency is not in itself a basis for disqualification from agency actions concerning those issues. *Cf. Ass'n of Nat'l Advertisers, Inc. v. FTC,* 627 F.2d 1151 (D.C.Cir. 1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980). *See also Laird v. Tatum,* 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (Memorandum of Rehnquist, J.).

dens. Faced with railroad bankruptcies and the need to assure railroads of adequate revenues, Congress revamped the structure of railroad regulation in order to restore the industry to health.

The Staggers Act was not, however, a simple deregulation of the railroad industry. Instead, it was a simultaneous recognition of two conditions. On the one hand, Congress recognized that in large parts of the rail industry heavily regulated rail carriers faced competitive conditions. In many cases these carriers competed with other modes of transportation which were unregulated and therefore able to be more innovative and flexible. Congress found that too often the ICA's regulatory framework had become an unnecessary and crippling burden on the rail industry, and was an impediment to the industry's ability to attract the capital necessary to meet· the nation's future needs.[5] On the other hand, however, Congress recognized that sometimes competition would be insufficient to protect the legitimate interests of shippers, small carriers, and the public, and thus that full deregulation of the industry was unjustified by industry conditions. The legislation that eventually became the Staggers Act was subject to significant modification during floor debate, with many of the successful amendments supported by legislators who feared that the bills that emerged from the committees might not afford adequate protection to shippers where they might otherwise suffer from abuses of market power. The resulting Act was a compromise that enjoyed overwhelming support. Although the legislation was without doubt a significant reduction in railroad regulation, as this court has said, "The legislation * * * did not strip the Commission of its power and duty to protect shippers from the unreasonably high rates of carriers with market dominance." *Burlington Northern Inc. v. United States,* 661 F.2d 964, 973 (D.C.Cir.1981). Both before and after the amendments the bills' sponsors agreed that the underlying approach of the legislation was to move toward much greater reliance on market forces rather than regulation to govern rail carriage, but to temper that move with a policy of retaining regulation where the market would be insufficient to protect shippers and the public from abusive railroad practices.[6]

---

**5.** Congressional findings were explicitly set out in § 2 of the Act. Among them were findings that

(3) today, most transportation within the United States is competitive;

(4) many of the Government regulations affecting railroads have become unnecessary and inefficient;

(5) nearly two-thirds of the Nation's intercity freight is transported by modes of transportation other than railroads;

(6) earnings by the railroad industry are the lowest of any transportation mode and are insufficient to generate funds for necessary capital improvements;

\*   \*   \*   \*   \*

(8) failure to achieve increased earnings within the railroad industry will result in either further deterioration of the rail system or the necessity for additional Federal subsidy; and

(9) modernization of economic regulation for the railroad industry with a greater reliance on the marketplace is essential in order to achieve maximum utilization of railroads to save energy and combat inflation.

Pub.L. No. 96–448, § 2, 94 STAT. 1896 (1980), *reprinted at* 49 U.S.C. § 10101a note (1982).

Similarly, § 3 set out as a goal of the Act "reform [of] Federal regulatory policy so as to preserve a safe, adequate, economical, efficient, and financially stable rail system[.]" Pub.L. No. 96–448, § 3(2), 94 STAT. 1897 (1980), *reprinted at* 49 U.S.C. § 10101a note (1982).

**6.** The legislative history of the Act is full of descriptions of it by conference committee members, sponsors, leading proponents, and floor leaders as a detailed and delicate compromise that accommodated the interests of carriers, shippers, and the public, reducing or eliminating regulation where appropriate and preserving regulatory protection for shippers where necessary. *See, e.g.,* 126 Cong.Rec. S14005 (daily ed. Sept. 30, 1980) (comments of Sen. Exon); *id.* at S14003 (comments of Sen. Cannon); *id.* (comments of Sen. Long); *id.* at H10086–H10087 (comments of Rep. Rahall); *id.* at H8555–H8556 (comments of Rep. Loeffler); *id.* at H8550–H8551 (comments of Rep. Rahall).

More important, this compromise nature is reflected throughout the Act. It is most recognizable in those general policy provisions of the Act that speak to shipper interests. The statement of goals includes as one of the Act's goals "to provide a regulatory process that balances

■ The Staggers Act exemption provision is an "important cornerstone" of the overall statutory scheme in that it represents Congress' determination that there be continuing evaluation of the appropriateness of regulation and continuing deregulation where consistent with the Act's policies. H.R.Rep. No. 96–1035, 96th Cong., 2d Sess. 60 (1980). It is also a recognition that an administrative agency is better suited than Congress to evaluate on a continuing basis the specific need for the various aspects of the regulatory scheme in particular contexts.[7] There is no doubt that the exemption provision was intended to give ICC very broad authority to eliminate unnecessary regulation. *See American Trucking Ass'ns, Inc. v. ICC*, 656 F.2d 1115, 1118–1120 (5th Cir.1981). Congress' delegation of exemption authority to ICC, however, was a conditional one. It included guidelines that conditioned that authority so as to preserve the policy balance embodied in the Act. As the Conference Report specified, the task of the agency is "to determine where [there] can be deregulat[ion] consistent with the policies of Congress." H.R.Conf.Rep. No. 96–1430, 96th Cong., 2d Sess. 105 (1980). The statue sets out these policies as conditions on the Commission's exemption authority. Where ICC properly finds the conditions to be present, it has no choice but to grant an exemption. But in the absence of such findings ICC has no exemption authority.[8]

As we discussed, petitioners in this case challenge the reasoning used by the Commission with respect to two limits with which Congress conditioned the ICC's exemption power: the element of national rail policy concerned with maintaining reasonable rail rates in the absence of effective competition, *see* 49 U.S.C. § 10101a(6) (1982), and the explicit limit on the ICC's ability to grant exemptions from regulatory provisions "needed to protect shippers from the abuse of market power." *See id.* § 10505(a)(2)(B). To understand how these issues arise in this case, we must turn to the Commission's complex opinion, that opinion's view of the export coal industry, and the Commission's analysis of the legal significance of its factual findings.

## II. THE ICC'S FINDINGS RESPECTING THE EXPORT COAL INDUSTRY

The ICC's opinion is premised on the general finding that in the absence of regulation railroads would be sufficiently constrained by various forms of competition that they would not be expected to abuse any market power they might hold with respect to shippers of export coal. Four forms of competition were offered and discussed by the Commission: (1) the competition that U.S. railroads face because the coal they carry for export must compete in a world coal market where numerous countries actively produce and market coal for export; (2) the geographic competition that each railroad faces because the coal it car-

---

the needs of carriers, shippers, and the public[.]" Pub.L. No. 96–448, § 3(4), 94 STAT. 1897 (1980), *reprinted at* 49 U.S.C. § 10101a note (1982). Similarly, the statute's declaration of national rail policy includes such policies as "to *maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital," id.* § 10101a(6), and "to avoid undue concentrations of market power[.]" *Id.* § 10101a(13). As we discuss in text, the elements of national rail policy limit the Commission's exemption power, *id.* § 10505(a)(1), and the power is further limited where the regulation to be lifted is "needed to protect shippers from the abuse of market power." *Id.* § 10505(a)(2)(B).

7. As the Conference Report states:

The policy underlying [the exemption] provision is that while Congress has been able to indentify [*sic*] broad areas of Commerce where reduced regulation is clearly warranted, the Commission is more capable through the administrative process of examining specific regulatory provisions and practices not yet addressed by Congress to determine where they can be deregulated consistent with the policies of Congress. * * *

H.R.Conf.Rep. No. 96–1430, 96th Cong., 2d Sess. 105 (1980).

8. *See* note 3 *supra* and accompanying text.

ries must compete with coal produced in other regions of the United States; (3) the intramodal competition that each railroad faces because shippers can switch to other railroads to carry their coal; and (4) the intermodal competition that a railroad faces because shippers can switch to other modes of transportation, *e.g.*, trucks, barges, or pipelines.

Petitioners argue here and they and the dissenting chairman of the Commission argued below that these factors simply cannot be expected to effectively constrain railroad market power, that 95 percent of the U.S. coal mines producing for export are served by only one rail line and have no practical alternative method of shipping their coal to port, and that after deregulation these shippers will likely fall victim to the monopolistic practices of the railroads upon which they must rely. They challenge much of the data relied on by ICC and assert that much relevant evidence was ignored or mischaracterized to justify a result contrary to the clear weight of the evidence. The Commission counters that past pricing patterns support the hypothesis that railroad practices have been constrained by market forces and, more important, the Commission predicts how future behavior will be sufficiently constrained. The dispute is in part a dispute over ICC's use of evidence in the record, but it is also a dispute over the legal question of how much constraint market forces must place on railroad behavior before the Commission can deregulate under the exemption provision. We will summarize ICC's discussion with respect to each of the four competitive factors, as well as petitioners' challenges to ICC's discussion. We will then analyze ICC's discussion of the significance of past railroad price behavior and, more important, its discussion of the legal significance of predicted future behavior. In this discussion ICC's understanding of the statutory standards for exemption emerged. We vacate because it is clear to us that ICC misunderstood the content of the statute's demands.

A. *Competition in the World Coal Market*

A large portion of the ICC opinion was devoted to explaining the position of U.S. coal in the world coal market. *See Decision, supra,* 367 ICC at 571–576. The analysis focused on the fact that "United States coal shippers face intense competition from major coal suppliers around the world[; that t]hese competitors are large, well organized, and sometimes government-supported firms in Australia, South Africa, Canada, Poland, and West Germany[; and] that suppliers in these countries have been quite effective in expanding their market shares in recent years * * *." *Id.* at 572.

The opinion painted a picture of a market in which nations aggressively market coal for use in Western Europe and the Far East for steel manufacture (called metallurgical coal or met coal) and generating electricity (called steam coal). Foreign purchasers initially evaluate suppliers "on the basis of quality and security of supply[,]" and because "[u]sually this process identifies several qualified suppliers[, purchasers reach a] final decision * * * almost invariably * * * on the basis of competitive price." *Id.* at 573–574. The market is price sensitive in that any increase in the delivered price of U.S. coal will likely result in a decrease in the quantity demanded and an increase in the quantity of coal purchased from other exporting nations. *Id.* at 575. Because rail transportation costs are a significant component of the delivered price of export coal, the market's price sensitivity, in ICC's view, will limit the ability of railroads to raise rates.

ICC admitted a number of factors that could arguably limit the degree of competition and create substantial foreign reliance on U.S. coal. For example, due to political instability, labor problems, export quotas, or insufficient capital, "[t]o some extent, each of the countries competing with the United States has been hampered in its efforts to expand production." *Id.* at 574. The United States, in contrast, has been a dependable, long-term coal source that can

thus demand a higher price. *Id.* at 576. Similarly, ICC admits that coal is not fungible: "There are certain requirements for particular uses because coal must possess the proper ash, moisture, sulfur, and carbon content, have the requisite volatility, and supply the necessary thermal units to be effective at a given site." *Id.* at 573. These "specifications are more rigid for metallurgical" coal, which "must be of a very high quality[,]" *id.*, and this has made "the United States * * * the chief supplier because of its high quality Appalachian coal." *Id.* at 575.

However, ICC went on to explain that these sorts of factors would not give the United States market power in the world market. It found that in spite of the fact that the U.S. is the most dependable supplier of coal and has substantial reserves, "the current development of [other] exporting countries and their plans for further expansion * * * leave little doubt that world coal supply will increase to meet any future increases in demand." *Id.* at 574.[9] It similarly found that the variability of coal qualities, the need for specified qualities for different uses, and the general high quality of U.S. met coal should not alter the conclusion that the U.S. cannot raise its coal prices without lowering its market share. ICC explained, "[I]t is clear that technological improvements in the production of coke and the manufacture of steel, as well as greater experience in blending coals of disparate characteristics to achieve a desired quality of coke, have lessened the restrictions on metallurgical coal and permitted the use of lower grade coal. This has allowed more suppliers into the market and greatly heightened world-

wide competition for metallurgical coal sales." *Id.* at 573 (footnote omitted). Moreover, any premium that U.S. coal can demand on the basis of quality or reliability of supply is already reflected in coal prices. *Id.* at 576.

ICC's analysis of the world coal market leads it to the conclusion that any increase in U.S. coal's delivered price will lead purchasers to increase their purchases from other nations. The U.S. market share would thus decline. Although the Commission's opinion contains no economic analysis of exactly how sensitive the world market would be to any U.S. price increases—indeed the discussion is quite general—it does conclude that the world market is "extremely sensitive to changes in the delivered price." *Id.* at 574. At one point it describes the world "pricing arena" as one "in which the world delivered price of coal is highly constrained by competitive market forces[.]" *Id.* at 592. At another point it concludes that "[p]rice competition for export coal is such that even a 10-percent increase in the delivered price of American coal can be the difference between obtaining a market or losing it entirely." *Id.* at 593.

ICC Chairman Taylor in his dissent and petitioners in this court react to ICC's analysis of the world market by challenging its relevance. Even if the world market is such that U.S. market share will decline as price increases, and indeed even if it would establish a world "price cap" above which market share would decline rapidly enough to reduce export coal profits, this would still not protect American shippers from abuses of market power by railroads.[10] The issue is not whether American inter-

---

**9.** *See also Decision, supra* note 1, 367 ICC at 575 ("Coal production has now been expanded throughout the world beyond the reasonable ability of the current market to absorb it, and this surplus is aggravated by the current decline in the world price of oil. These trends ensure that there will most likely continue to be vigorous price competition in the world * * * market at least for the near future." (footnote omitted)).

**10.** Petitioners did not agree that U.S. rail carriers would lack market power in the world mar-

ket. For example, one brief cites statistics that first show that ⅔ of all U.S. coal exports are met coal and only ⅓ are steam coal. They go on to show that in 1980 ⅔ of Western Europe's met coal imports were from the U.S. They also point out that the Department of Justice, in its filing to the Commission, "stated that the U.S. 'appears to be the dominant supplier' of low and medium volatile metallurgical coal, and that * * 'U.S. railroads would have substantial market power' because 'N & W and CSX (Chessie) have a virtual duopoly on the transportation of met coal.'" CEA/NCA brief at 32 n. *, *quoting* JA

ests have market power in the world coal market, but whether one component of the American export picture, railroads, have market power in relation to another component, coal producers and other shippers. Even if there is a "price cap" that prevents raising the delivered price of export coal, a railroad could still use monopoly power to raise rates to coal shippers and appropriate to itself an unreasonable portion of the profits generated by each shipment. Because of the cap, a captive shipper would be forced to lower its share of the total coal revenues if confronted with a rail rate increase. Although the existence of a world price cap for delivered U.S. coal means that foreign consumers will not have to pay a higher price, it does not assure that the division of revenues between the railroads and U.S. shippers will be a reasonable one. *See id.* at 600–601 (Chairman Taylor, dissenting).

B. *Geographic Competition*

In addition to the world market's constraining effect on rail pricing, ICC emphasized that geographic, intramodal, and intermodal competition would also constrain the practices of deregulated railroads. ICC began its analysis of geographic competition with an explanation of the regional nature of U.S. export coal production. "Eastern" coal is that mined in the Appalachian coalfields. Until 1979 the export coal industry centered around shipments of Appalachian metallurgical coal, but since that year's huge oil price increases steam coal export has also become important. *Id.* at 575. Eastern coal export includes both met and steam coal, and export production is mostly shipped to Europe. *Id.* at 577–579. "Midwestern" coal has a relatively high sulfur content and is mined in Ohio, Indi-

ana, and Illinois. *Id.* at 577. ICC does not make clear to what use this coal is put when exported, but export production mostly goes to Europe as well. *Id.* at 579.[11] "Western" export coal includes coal from Colorado and Utah, where "small though increasing amounts" are sent to the Far East through West Coast ports. Coal from Wyoming's Powder River Basin, though there are vast tonnages, does not yet move for export because of its low BTU content. Prior to the 1979 oil price increase, virtually no western or midwestern coal was exported. By the third quarter of 1981 these coals made up about 12 percent of total export coal traffic.

Generally, different rail carriers transport the export coals of different regions. In the East and Midwest two rail systems transport most of the export coal: the Norfolk & Western Railway Company and the Chessie System (which includes both the Baltimore & Ohio and the Chesapeake & Ohio). Conrail transports small amounts of eastern export coal. Other railroads operate in the West. *Id.* at 577–579. ICC's belief that to some degree competition between regions would act as a restraint on railroad power is premised on the notion that a foreign purchaser could purchase American coal from another American region if a price increased as a result of a railroad's raising prices. This would result in that railroad's loss of business just as if the purchaser had switched to the coal of another country. *Id.* at 579.

In support of its prediction the Commission cites the growth of western and midwestern export sales between 1979 and 1981 and the fact that during the same period the eastern railroads' percentage share of nationwide export traffic dropped. As ICC concluded:

639–640 (Justice Department submission to ICC). ICC Chairman Taylor similarly noted:
There is considerable question regarding the effectiveness of competition in the movement of metallurgical (met) coal to Western Europe. The U.S. supplies 55 percent of Western European met coal and is considered the "swing supplier." The major alternative suppliers, Australia (labor problems), Poland (strikes and martial law), South Africa (political unrest and self-imposed quotas), and the

U.S.S.R. are not considered reliable substitutes for U.S. coal.

*Decision, supra* note 1, 367 ICC at 600 n. 78 (Chairman Taylor, dissenting).

11. Petitioners made an issue of what the possible uses of midwestern coal were. They offered evidence to show that it could not practicably be used as a substitute for either eastern steam coal or met coal. *See* note 15 *infra.*

Although generally western coal for export now moves only to the Pacific Rim countries and the primary export market for eastern and midwestern coal is in Europe, competition among the regions appears to be growing. * * *

*Id.*

The idea that regional competition could be a significant constraint on railroad practices was challenged below in Chairman Taylor's dissent. He and the petitioners complained that, by ignoring the differences between coal qualities, volumes, and costs that result in part from geographic distance, the Commission found significance where none could reasonably be found:

[G]eographic and product competition within the United States is neither a counterbalance nor a solution to the problem. The coal producing regions of the U.S. do not compete with each other for most of the export market. According to the railroads' own testimony, the vast coal reserves now available in the Powder River Basin (Montana and Wyoming) are a very long distance from port (over 1,000 miles) and the coal in such reserves is not of export quality, because its energy value is less than 10,000 BTU's and it has a relatively high moisture content. [Midwestern coal] is not of met quality and has too much sulfur for all but a small part of the steam coal export market. Coal from Colorado, Utah, and New Mexico goes to Japan, where there appears to be some competition with eastern coal. However, these western reserves produce no met coal, and the delivered price to Japan of eastern steam coal is more than $20 per ton higher than the delivered price of [this western coal]. Therefore, competition between the two sources is minimal. Almost all of our steam and met coal exports to Europe move through Atlantic ports.

*Id.* at 602 (Chairman Taylor, dissenting).

C. *Intramodal Competition*

Although Chairman Taylor and petitioners argue strenuously that export coal pro-

ducers are largely captive to particular railroads and would thus be subject to railroad market power, the Commission found that intramodal competition (*i.e.*, competition between railroads) would provide significant constraints on railroad practices.

ICC did agree to many of the facts that underlay Chairman Taylor's and petitioners' arguments. In the East "very few mines are located on the lines of more than one railroad." *Id.* at 577–578. And "[e]xport coal originated on the lines of an eastern rail carrier is generally transported in single-line service to that carrier's own export coal facility." *Id.* at 578. Deviations from single-line rail transit would bring into play joint or combination rates that would be substantially above the single-line rates. *Id.* at 577 n. 19. In the West, "[a]s in the East, individual mines are generally located on the lines of only one railroad." *Id.* at 579. For a variety of reasons, in spite of these facts ICC found that intramodal competition would be a significant restraint on railroad practices.

The Commission focused its analysis not on the individual mine but on an export coal "broker known as a transshipper." *Id.* at 571. Most export shipments are arranged by transshippers, which are very large companies that enter contracts with foreign purchasers, put together orders from a number of U.S. mines, and then arrange transportation. The mines may be owned by the transshipper or by other companies. *Id.* Because of the great size of the leading transshippers, and more importantly because they are free to fill their orders from mines on several rail lines, they have substantial bargaining power with respect to rail rates. *Id.* at 572. Their bargaining power may be even further heightened because many are owned by larger conglomerates that "may in some instances be able to exert leverage over particular railroad rates" as a result of other rail shipments with the railroad. *Id.*

ICC also argued that a large portion of export coal comes from mines owned by

large coal companies, and that many of these companies own numerous mines located on different railroads. *Id.* at 578. Such a shipper's ability to shift production among its mines might allow it to pit one railroad against another and thus create intramodal competition to reduce a railroad's bargaining power. *Id.*

Again, the dissent and petitioners bitterly dispute the Commission's analysis and assert that the Commission failed to make certain inquiries necessary to its theory's validity and ignored significant evidence that would have called its theory into question. For example, Chairman Taylor first argued that the Commission ignored significant reasons to doubt that transshippers could sufficiently constrain railroads.

The premise underlying the argument that export contracts can be freely filled from mines on more than one railroad is also unrealistic. First, export tonnage is frequently a blend of coal from several mines, and many times, some mines are on one railroad, some on another. Second, for a shipper to be able to substitute tonnage from a mine on a second railroad, certain conditions must be met, i.e., the tonnage must be available and not already committed to a long-term contract, the extraction costs must be relatively the same, and the tonnage from the second mine must be technologically substitutable for the tonnage from the first. Shippers point out that the chance for such substitution does not usually occur, especially since the Chessie hauls primarily met coal and the N & W primarily steam coal.[12] Third, there must be no price leadership, in that if one railroad raises its rates, the other will not, or at least not to the same level. It appears highly unlikely that all three of the foregoing conditions would coalesce, and even if they did, the advantage would accrue only to the particular shippers affected. The fact remains that 95 percent of the mines producing export coal are captive to the railroads that serve them.

*Id.* at 602. He then argued that the Commission's theory concerning the power of large shippers was similarly built on assumptions about the industry that ran counter to the evidence.

The argument that big shippers can play one railroad against another (i.e., by substituting tonnage from mines served by more than one carrier) is still less convincing, even were one to ignore the problem of lack of substitutability [of particular coals]. When a shipper negotiates with a railroad, its corporate affiliation is less important than its access to alternate transportation. There are over 100 companies involved in the export coal trade. Although some of the shippers are large, with connections to still larger entities, only 24 percent of the mines served by the Chessie System and the N & W are controlled by operators having mines on both railroads. As for the West and the Midwest, there appears to be virtually no possibility of substitution between railroads at the present time.

*Id.* at 602–603.

### D. *Intermodal Competition*

The Commission also concluded that deregulated railroads would have their market power constrained by competition with other modes of transportation. Three other modes are mentioned in the opinion: trucks, barges, and pipelines. The Commission noted, however, that truck and barge movement of export coal would not be feasible in the West. *Id.* at 579.

In support of its reliance on intramodal competition the Commission cites data showing that 13 percent of all coal production in the nation is transported by truck, *id.* at 578 & n. 21, which demonstrates that

---

12. According to a study submitted to the Commission on behalf of petitioners, the two major eastern railroads had to a great extent divided the export market between them according to coal type. Thus, in 1980, Norfolk & Western participated in shipping 93% of all eastern steam coal tonnage shipped for export, while Chessie participated in 13%. Chessie participated in shipping 81% of all met coal tonnage, while Norfolk & Western participated in 24%. *See* JA 994.

trucks can successfully compete for short-haul movements of coal.[13] While mine-to-port traffic is usually long-haul, in the Commission's estimate trucks can "create[ ] the real potential for intermodal truck-barge or truck-rail movement to compete with an all-rail movement." *Id.* at 578.

To the extent a mine has access to inland waterways, ICC reasoned, barges can offer an alternative to rail carriage. This can result from a truck-barge combination or from direct access to waterways. The Commission offered statistics showing that "during the first 9 months of 1981, 17 percent of reported tidewater and coastal port shipments (nearly all of which is for export) was handled by inland water carriers." *Id.*

The last form of intermodal competition mentioned by the Commission is coal-slurry pipeline movement. There is no discussion of this, but at two points competition from coal-slurry pipeline is referred to as being a "partial" or "potential" competitive restraint on railroad power. *Id.* at 589 n. 42, 594.

Petitioners and the dissenter dispute most of the premises on which the Commission built the argument for intermodal competition. They first point out that, although the Commission refers to coal-slurry pipeline competition, no such pipeline exists in the United States, *see id.* at 601 (Chairman Taylor, dissenting), and petitioners argue that construction of one would require difficult-to-pass federal legislation.

Petitioners challenge the Commission's reliance on barge transport by arguing that ICC's 17 percent estimate of coal transported at least in part by barge neglects to note a number of important points: (1) The figure was submitted by the railroads and conflicts with a previous ICC estimate placing the figure at seven percent, CEA/NCA brief at 18 n. **. (2) Much of the coal traffic that was transported in part by barge was initially carried from the mine by the same railroad that would otherwise have taken it to port via single-line route. A railroad that serves the origin exclusively would thus have power to determine the extent of export barge traffic movement and its cost.[14] (3) Much of the barge-transported coal is high-sulfur midwestern coal, which offers little competition to lower-sulfur eastern steam or met coal.[15] (4) Even if some mines are close enough to waterways to be able to use barges without initial reliance on a railroad, such a situation is quite rare.

Their reaction to the Commission's discussion of truck transport was to emphasize that coal is a commodity of sufficient bulk that "truck competition is not econom-

13. It seems undisputed that the 13% figure refers to all coal produced, not just coal produced for export. *See Decision, supra* note 1, 367 ICC at 601 (Chairman Taylor, dissenting). Petitioners submitted evidence that less than 1% of export coal is transported to port by truck. CEA/NCA brief at 17 & n. **.

14. Both petitioners and the dissenter note that, until complaints had been filed with ICC, eastern rail carriers, to discourage use of barges, had charged rates on export coal going to the Ohio River that were higher than the rates charged on export coal going to the railroads' Atlantic port facilities:

> Barge transportation [thus] almost always involves a prior movement by rail, which makes the railroad indispensable to the water carrier's ability to carry coal. * * * [Only] because the shippers and competing barge lines had recourse under the Interstate Commerce Act [did] the railroads drop[ ] their rates to the river to the domestic level.

*Decision, supra* note 1, 367 ICC at 601 (Chairman Taylor, dissenting).

15. Although ICC did not explain its assertion that high-sulfur midwestern coal was substitutable for other coals, Chairman Taylor argued that midwestern coal "is not of met quality and has too much sulfur for all but a small part of the steam coal export market." *Decision, supra* note 1, 367 ICC at 602 (Chairman Taylor, dissenting). Evidence submitted by petitioners supported this view. They contended that midwestern coal cannot be substituted for met coal because of its sulfur content and cannot easily be substituted for steam coal in Europe because of European air pollution requirements that focus on coal quality. They argued that much of the coal exported from the midwest is used in cement manufacture and thus is not in competition with higher quality steam and met coals. *See* CEA/NCA brief at 27 & n. * (*citing* studies at JA 876–878, 1130).

ically practical for large shipments or long distances." *Decision, supra,* 367 ICC at 601 (Chairman Taylor, dissenting).

### E. *The Commission's Discussion of Rail Pricing History*

After discussing these forms of competition, the Commission turned to the history of rail pricing of export coal shipments and concluded that that history supported the conclusion that the competitive factors in fact had constrained railroad pricing. Two arguments were relied on.

First, the Commission noted that no maximum rate complaints concerning export coal rates had been filed prior to 1980. "Moreover, the 1980 complaints appear to have been filed not because of any new railroad rate actions, but because section 229(b) of the Staggers Act provided that rates not challenged by a certain date would forever thereafter be conclusively presumed lawful." *Id.* at 580. In contrast to the pattern for domestic coal transport, where the railroads sought to test and expand the bounds of the rate standards— thus generating many complaints—export coal carriers "were content to raise their rates only in connection with general rate increases for all traffic[,]" and "[i]ndeed, the railroads 'flagged out' of several general rate increases on export coal." *Id.*

The Commission also compared the overall rise in coal prices and rail prices from 1969 to 1974, and from 1969 to 1981, and found that the comparisons showed "at a minimum that the unregulated shippers of export coal have considerable economic bargaining power in the contest over division of the economic rents from export coal. * *

This history indicates that the pricing restraint of rail carriers was not the result of the exercise of regulatory power by this Commission, but rather resulted from the play of market forces." *Id.* at 580–581.

Again, the opponents of the decision have argued that the Commission has misused data and ignored relevant factors. They argue that the 1980 complaints concerning export rail rates have never been litigated by the Commission, were accompanied by evidence that rates were generating revenues 200%–300% above the railroads' variable costs, and thus are strong evidence of railroad market power and cannot be so lightly dismissed by the Commission. *See* CEA/NCA brief at 33–34. Moreover, they challenge ICC's history of railroad pricing because its figures emphasize pricing behavior before 1976 when rail rates were heavily regulated.[16] Figures limited to the period since 1976, they say, would show significant railroad market power.[17]

### III. ICC's PREDICTIONS OF FUTURE RAILROAD BEHAVIOR AND ITS ANALYSIS OF THE EXEMPTION PROVISION'S LEGAL STANDARDS

The foregoing discussion summarizes ICC's evaluation of data concerning competitive forces that would limit deregulated railroads' ability to abuse market power or unreasonably raise rates. It also reflects the challenges made to this part of ICC's analysis. ICC and the railroad intervenors have in their briefs and at oral argument contended that the Commission, as an expert agency, was entitled to make the factual findings and analyses that it did and

---

**16.** In 1976 Congress enacted the Railroad Revitalization and Regulatory Reform Act of 1976 (4–R Act), Pub.L. No. 94–210, 90 STAT. 31 (1976). This forerunner of the Staggers Act was a significant lessening of regulation. In contrast, before 1976 "the ICC was charged with general superintendence of rates for transportation by rail. A 'just and reasonable' standard controlled all rates, rail users could challenge the reasonableness of rates, at any time, and the Commission had authority to determine what constituted a just and reasonable rate in each case."

*Ford Motor Co. v. ICC,* 714 F.2d 1157, 1158 (D.C.Cir.1983).

**17.** *See* joint reply brief of petitioner Eastern Coal Transportation Conference and intervenor-petitioner Coastal States Energy Company at 14 ("Far more probative is the record from 1976 to 1981 when, utilizing new rate freedoms granted by the 4–R Act, carrier rates on export metallurgical coal rose by 59.5%. During the same period, minehead prices for the same product *declined* by almost 9%." (emphasis in original)).

based on those findings to conclude that an exemption could be granted because market forces would sufficiently constrain railroads. Petitioners repeatedly assert that ICC's findings and analysis were counter to the evidence presented, ignored significant data and comments, and thus should be found arbitrary and capricious. The finding that market forces would *sufficiently* constrain railroad behavior, however, is only in part a question of analysis of data; it begs the question how much market constraint on railroad behavior is sufficient. Put another way: what must ICC find before an exemption is justified? This is a legal, not a factual, question, and it involves not so much an analysis of the factual record concerning the structure of the relevant industry, but an examination of precisely what ICC actually found, what legal standard ICC used, and an analysis of how that conforms to congressional intent and the reasoned decisionmaking requirement. When we examine ICC's explanation of the legal theory for its decision, however, we discover that much of the basis for ICC's decision to exempt export coal is only indirectly related to many of the competitive factors that it discussed at such length.

A. *ICC's Findings with Respect to the Existence of "Market Power" and the Presence of "Effective Competition" and ICC's Predictions Concerning Price Discrimination by Railroads*

As discussed, the major shipper-protective limits on ICC exemption authority are 49 U.S.C. §§ 10101a(6) and 10505(a)(2)(B) (1982). The former provision establishes that national railroad policy is "to maintain reasonable rates where there is an absence

of effective competition" so long as railroads earn revenues "which exceed the amount necessary to maintain the rail system and to attract capital." The latter limits the exemption power where regulation is necessary to "protect shippers from the abuse of market power."

■ We begin with our analysis by noting that the limits these provisions place on ICC's exemption power are met with a proper finding of an absence of "market power" and the presence of "effective competition." *See, e.g., Brae Corp. v. United States, supra,* 740 F.2d at 1054 (Commission found no "market dominance"), *id.* at 1054 (Commission found no "monopoly power by railroads"). In this case, however, ICC never explicitly reached a conclusion that the railroad system carrying export coal would face "effective competition" and lack "market power." Indeed, the Commission specified that "the issue is not whether deregulation will give the railroads *some* market power but whether we conclude that an exemption will result in abuse. * * * [W]e point out that we may make a ['not needed to protect shippers from the abuse of market power'] finding even when there is no effective competition." *Decision, supra,* 367 ICC at 592 (emphasis in original).[18]

ICC's predictions concerning future railroad pricing policies make even clearer that its exemption decision was not premised on either an implicit or an explicit finding of "no market power" or of "effective competition." ICC's discussion of how the railroads are likely to behave in an unregulated environment rested on the premise that unregulated railroads would be able and willing to price discriminate actively among coal shippers. Price differences would not

---

**18.** The Commission was correct in this assertion. The Conference Report makes clear that even where there is no effective competition constraining railroad market power an exemption may be proper if there will nevertheless be no abuse of market power. The kinds of situations envisioned, however, are not clear. The only one alluded to in the report is where other federal remedies would assure that market power will not be abused. *See* H.R.Conf.Rep. No. 96–1430, *supra* note 7 ("The bill permits exemptions wherever regulation is not needed to prevent abuses of market power, regardless of the presence of effective competition. * * * The conferees anticipate that through the exemption process the Commission will eventually reduce its exercise of authority to instances where regulation is necessary to protect against abuses of market power where other federal remedies are inadequate for this purpose.").

simply reflect differing costs of providing transportation, but instead would reflect the availability to each shipper of transportation alternatives and each shipper's long-term marginal costs.

The regime of price discrimination envisioned by the Commission clearly assumes some significant degree of railroad monopoly power. First, it is well established that the ability of a firm to price discriminate is an indicator of significant monopoly power. *See, e.g.,* 2 P. AREEDA & D. TURNER, ANTITRUST LAW 342 ("[P]ersistent price discrimination * * * clearly indicates * * * that there is a lack of effective competition in the market where the higher net returns are made. In other words, it shows that the seller has market power."); R. BORK, THE ANTITRUST PARADOX 395 (1978) (it is "essential" to "[p]ersistent or stable price discrimination in favor of specific customers" that a "seller possess[ ] * * * a substantial degree of market power or monopoly"); R. POSNER, ANTITRUST LAW 63 (1976) ("[p]ersistent discrimination is very good evidence of monopoly because it is inconsistent with a competitive market"); L. SULLIVAN, HANDBOOK OF THE LAW OF ANTITRUST 89 (1977) ("A firm will not discriminate unless it has market power."). Second, the way the Commission discussed its predictions of price discrimination makes clear that it assumed railroads would have some significant degree of monopoly power.

ICC's prediction of future price discrimination was, in part, framed as a response to the comments opposing the exemption filed by the Departments of State and Commerce, the petitioners, and National Economic Research Associates (NERA), a research firm that submitted an extensive economic study on petitioners' behalf. These groups raised most of the points already discussed concerning the likely inability of competitive factors to supply effective competition to export coal carriers. They concluded that an exemption would allow railroads to use monopoly power to raise rates substantially, and that that

would reduce demand for U.S. coal abroad and thus reduce production levels. ICC summarized these arguments as follows:

> [They] believe that the railroads are[, because of the high proportion of shippers who are captive,] in a position to extract substantial premiums without fear of diverting traffic to other carriers. They fear that if export coal were deregulated the railroads would choose to raise rates to the point where a given volume will maximize revenues, even though some coal producers are excluded from the market and overall production is reduced. They perceive substantial potential for railroad abuse of market power and predict severely reduced coal exports and an overall decline in the Nation's prosperity.

*Decision, supra,* 367 ICC at 583; *see also id.* at 584.

The Commission's principal response was to assert that railroads would not price as would "simple monopolists" and reduce production levels. Instead, by price discrimination they could receive both monopoly revenues *and* maximized production. In the Commission's words:

> Opponents argue that railroads would accept the loss of some export coal since the loss would be more than offset for the railroads by an increased return on each ton of coal moved at higher rates. However, opponents' belief is the result of their mistaken assumption of uniform rate increases, *e.g.,* in the NERA model, the railroads are assumed to act like simple monopolists. A simple monopolist must accept the loss of one customer's business in order to raise prices to its other customers. The railroads, however, have persuaded us that they are not likely to act as simple monopolists but will price their services according to the cost and demand characteristics of each particular mine in order to retain the traffic. * * *

*Id.* at 592-593.[19] Indeed, the Commission attached an appendix to its decision where

**19.** *See also Decision, supra* note 1, 367 ICC at 587-588:

it analyzed the NERA study and offered as its major reason for not crediting it that "the NERA study is * * * based on a simple rather than a discriminating monopoly situation as discussed in the text." *Id.* at 615 (Appendix A).

ICC never explicitly found the presence of "effective competition." Moreover, its extensive discussion of the railroads' ability to sustain a regime of price discriminating based on shippers' long-term marginal costs and access to transportation alternatives, its description of such price discrimination as "a discriminating monopoly situation," and its emphasis on its authority to grant an exemption even if there would be market power and no effective competition, all make clear that ICC was not implicitly finding that these factors established a sit-

> Exemption will free the railroads to maximize their revenues by pricing on the basis of market demand and each mine's longrun marginal cost (including a return on cost of capital). By charging some of their more price-sensitive mines a lower rate and keeping them in the market, the railroads will be able to increase their revenue above what they would realize by increasing prices uniformly, as they have done in the past.

(Footnote omitted.)

20. Our discussion of price discrimination and our citation to antitrust law texts is, of course, not meant to imply that ICC's understanding of "effective competition" must "strictly conform" to antitrust law standards. *See* S.Conf.Rep. No. 94–595, 94th Cong., 2d Sess. 148 (1976) ("While the absence of effective competition test is not intended to strictly confrom [*sic*] with the standards of the antitrust laws, it is intended that when the Commission administers the test it will recognize the absence of forces which normally govern competitive markets.") (report on the 4–R Act).

We also note that ICC's discussion of such competitive factors as geographic, intramodal, and intermodal competition did not attempt to analyze or define the degree to which these forces could actually provide shippers and receivers with substantial enough quantities of sufficiently substitutable goods or services at competitively practical prices. The absence of such relatively specific inquiries would seem to be another factor indicating that "effective competition" was not found. *See Market Dominance Determinations and Consideration of Product Competition*, 365 ICC 118, 132–135 (1981).

What the Commission clearly did argue in its opinion was that market forces did establish

uation of effective competition.[20] Instead, ICC accepted a model of railroad price discrimination under which carriers—because of the price cap for American coal in the world market—would price within the constraint of not raising the delivered price of the coal, and thus could maximize their profits without reducing production. The method by which rates would be determined and revenues divided between shippers and railroads is explained as follows:

> [I]f (1) the world market will tolerate a port price of $50 a ton, (2) a mineowner could produce the coal for $20 a ton, and (3) the railroad could haul it to the port for $20 a ton, then the available profit to be shared between the producer and the railroad would be $10 a ton. If the rail-

"substantial" constraints on railroad behavior. But that is not in conflict with the existence of monopoly power. As a leading economics text explains, all firms, even the pure monopolist— an entity which rarely exists in the real world— are subject to limits established by market forces. The issue is how effective are the limits.

> [T]he policies adopted by a pure monopolist are affected by certain indirect and potential forms of competition. Clearly, the monopolist is not completely insulated from the effects of actions taken in the rest of the economy. All commodities are rivals for the consumer's favor * * *. Clearly this rivalry occurs among different products, as well as among the producers of a given commodity. For example, meat competes in this sense with butter, eggs, and even men's suits. Of course, the extent of the competition from other products depends on the extent to which other products are substitutes for the monopolist's product. For example, even if a firm somehow could obtain a monopoly on the supply of steel in a particular market, it would still face considerable competition from producers of aluminum, plastics, and other materials that are reasonably good substitutes for steel.

E. Mansfield, Microeconomics: Theory and Applications 281 (3d ed. 1979).

Nor is there a conflict between ICC's predictions of future exercise of railroad monopoly power and its descriptions of past pricing behavior as being restrained by "the play of market forces." *Decision, supra* note 1, 367 ICC at 581. A close reading of its discussion of past pricing reveals that it states only that past behavior "is not the kind of behavior which we think characterizes entities exercising *unrestrained* market power." *Id.* at 580 (emphasis added).

road has numerous alternatives and the coal producer has none, the railroad would be likely to receive much of the $10 a ton profit. Similarly, if the coal producer is the party with the opportunities to mitigate the adverse consequences of failure to agree, then the coal producer would receive much of the profit. In many instances, both parties will probably have some alternatives, and the division of the profit should be somewhere between these limits. Under all possible divisions of the available profit, the competitive price of $50 a ton would prevail in the marketplace, and there would be no effect on the volume of coal purchased or produced. * * *

*Decision, supra,* 367 ICC at 582.

Although this model of price discrimination explains how railroads might earn monopoly profits without lowering production, it says nothing about what the distribution of rents between shippers and carriers would be. All it says is that the division will be at a point between that at which the shipper only recovers its costs while the carrier recovers all rent and that at which the shipper recovers all rent while the carrier recovers only its costs. *See id.* at 595 ("the railroads will * * * set their rates in an area between an individual mine's long-run marginal cost of extraction at the current cost of capital and the world market price"). The precise point will be determined by the amount of transportation competition that does exist for any particular shipper within this basically monopolistic framework. The competitive factors that we earlier discussed thus again become important. The degree to which they are present in any given case will determine the distribution of rents between shipper and carrier.

We will return to the question of exactly what legal import the Commission has assigned to these competitive factors when we discuss the ICC's analysis of the "not needed to protect shippers from the abuse of market power" provision of Section 10505(a)(2)(B). But first we turn to ICC's analysis of the provisions of the rail trans-portation policy, particularly the provision relating to "reasonable rates."

## B. *ICC's Analysis of the Rail Transportation Policy and Particularly of Section 10101a(6)*

■ In order to grant an exemption ICC must find that the regulations to be lifted are "not necessary to carry out the transportation policy of [49 U.S.C. § 10101a]." 49 U.S.C. § 10505(a)(1) (1982). In its opinion ICC stated that it found that "[c]ontinued regulation of export coal traffic is not needed to carry out any of the 15 elements of rail transportation policy set out in 49 U.S.C. 10101a." *Decision, supra,* 367 ICC at 586. Although it discussed how the exemption would further a number of the policy provisions, it hardly mentioned the provision of the policy most clearly related to petitioners' claims, the provision that it is national policy "to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital." 49 U.S.C. § 10101a(6) (1982). The Commission mentioned Section 10101a(6) only once in its opinion, and then in a footnote that implied that the provision was inapplicable.

The one mention of Section 10101a(6) came in response to shippers' citations to various parts of the legislative history that referred to the need for protecting "captive shippers," particularly coal shippers. The Commission's cryptic response was simply that

export coal must be distinguished from domestic coal transportation. Export coal traffic is not the captive traffic for which Congress continued rate regulation. See 49 U.S.C. 10101a(6). Rather, as we discuss elsewhere in this report, this traffic is subject to vigorous and growing competition from the world market and other transportation modes and energy sources, and these forces will provide adequate restraints on rates.

*Decision, supra,* 367 ICC at 585 n. 32.

■ This reference to Section 10101a(6) is troubling. The section is intended to

protect shippers of any commodity where there is an absence of effective competition. Here, the Commission made no finding of effective competition. As discussed, such a finding would clearly have been in substantial tension with other language in the opinion. In spite of the assertedly "vigorous and growing" competitive restraints on the railroads' ratemaking power, the Commission predicted a regime of price discrimination that assumed railroad market power over shippers. Thus the Commission must still justify the exemption's consistency with Section 10101a(6)'s assurance of reasonable rates in the absence of effective competition.[21] What explanation there is appears in the Commission's more general analysis of the "abuse of market power" provision.[22]

### C. *ICC's Analysis of the "Abuse of Market Power" Standard of Section 10505(a)(2)(B) and its Application to This Case*

Most of ICC's analysis of why continued regulation "is not needed to protect shippers from the abuse of market power" focused on the establishment of rail rates and the division of revenues between railroads and shippers under the predicted system of price discrimination. It is also where the Commission made clear its understanding of the "abuse of market power" concept as it applies to an exemption where market power does in fact exist.

We look at this analysis to understand the Commission's conception of its responsibility to assure that reasonable rates will be maintained, and because we conclude that there was no proper consideration of the shipper protective limitations on the exemption power, we vacate the exemption granted in this case.

The Commission began its analysis of the "abuse of market power" concept by recalling that it had found that "strong worldwide competition" existed for export coal, and that American rail carriers could not by their unilateral action raise the delivered price that foreign users would pay. Given the Commission's expectation that the railroads were so constrained by the world price, the Commission asserted that

> the issue of the potential for market abuse by the railroads must be analyzed in the context of the question of whether the railroads will be able to appropriate all of the economic rents created by the difference in the costs for producing and shipping export coal and the world market price for that coal.

*Decision, supra,* 367 ICC at 592. It then went on to conclude that "the railroads will not price their services so as to reduce American coal production." *Id.* These two elements become, for the Commission, the standard under which it evaluates whether or not an exemption will result in an abuse

---

**21.** "Effective competition" is not only the standard for rate protection contained in § 10101a(6). It is also the standard in the rate provisions themselves. The Staggers Act withdrew ICC jurisdiction to regulate the rates of carriers who do not have "market dominance" over the relevant shipper. 49 U.S.C. § 10709(c) (1982). "Market dominance" was defined as "an absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies." *Id.* § 10709(a). As we have said, the agency made no explicit or implicit finding of "effective competition."

**22.** Although the reference discussed in text was the only reference to § 10101a(6), the failure to discuss the section explicitly is not in itself fatal. But the Commission must nonetheless offer reasoning that assures this court that § 10101a(6)'s protection was properly considered and applied.

> The national transportation policy must guide the ICC in all its decisions. However, the ICC need not explicitly discuss in its decision each factor enumerated * * *. All that is necessary is that the essential basis of the ICC's rationale be clear enough so that a court can satisfy itself that the ICC has performed its function. * * *

*Alamo Express, Inc. v. ICC,* 673 F.2d 852, 860 (5th Cir.1982) (citations omitted).

An explanation of the exemption's conformity with the rate reasonableness policy is especially important here, where petitioners throughout their participation below emphasized their concerns for rate reasonableness and submitted substantial amounts of evidence to support their contention that rates will not be reasonable after exemption.

of market power. In other words, so long as coal shippers are not forced to reduce production (*i.e.*, so long as the rail rate leaves them a share of the revenue that covers their costs, including their costs of capital) and so long as they are not wholly excluded from any economic rents above that level, their rate is "reasonable" and there is no "abuse of market power."

Use of this standard can be seen in the Commission's repeated equation of a situation of reasonable rates or the absence of market power abuse with the situation in which shippers recovered their costs and were thus able to maintain production levels and maybe even to acquire some economic rents. *See id.* at 587 (transshippers will have sufficient leverage "to prevent the railroads from appropriating all the rents"); *id.* at 593 (railroads will not "raise rates to the point where the traffic stops moving"); *id.* (rate increases are unlikely to be so high as "to reduce the volume of export coal significantly or to force the mineowners into a situation where their return on investment would be inadequate"); *id.* (railroads will not "appropriate all the economic rents"); *id.* at 594 (railroad will not abuse its market position by "raising rates to the point where the traffic stops").

One aspect of this standard is crucial: It is a standard which, in effect, views the distribution of economic rents between carriers with market power and shippers to be largely a matter of regulatory indifference, so long as shippers get some bare minimum. Other than assuring that production will not decline and that "all" rents will not go to the carriers, the Commission only assures that "[e]conomic rent will be divided in accordance with the relative bargaining power of the parties involved in particular cases. In some cases the shipper will have leverage; the converse will be true in others." *Id.* at 595 n. 67. This regulatory indifference was viewed as proper, in spite of the fact that the situation envisioned would be one in which market power would exist and indeed determine the distribution of rents. As the Commission had stated, "[C]oal rates in an exempt environment will

reflect the interplay of the economic strengths of all parties. That result is, we believe, exactly what Congress meant when it enjoined us in the [national transportation policy] to allow 'to the maximum extent possible' competition and demand for services to establish rail rates." *Id.* at 587.

It is important to note the role, within the Commission's legal argument, played by some of the competitive factors discussed at such length earlier in the opinion. In particular, such factors as geographic, intramodal, and intermodal competition provide the parties with the bargaining power that will determine the division of economic rents between them. But because the Commission views almost all divisions as consistent with the policies of the Act, so long as shippers are not deprived of all rents, the legal importance of these factors seems very slight. Although the Commission, throughout its opinion, continues to insist in general terms that these competitive forces will give shippers substantial bargaining power and thus constrain railroads and assure reasonable rates, it simultaneously voices a standard under which any shipper bargaining power, over a bare minimum, is legally sufficient. We will return to evaluate the Commission's reliance on these competitive forces after evaluating the legal validity of the standard used by the Commission.

D. *The Legal Validity of the ICC's Understanding of the Statute's Protection for Shippers*

We vacate the Commission's exemption decision because the stated standard is a wholly unreasonable construction of the Staggers Act's accommodation between shipper and carrier interests. The concept of rate reasonableness in the Act is a complex one and one whose precise definition was generally left to ICC. Nevertheless, it is clear that Congress did intend for the concept to embody certain considerations, and that the division of revenues between monopolistic carriers and shippers (even when the shipper is still able to fully recov-

er its costs) was certainly not a matter of regulatory indifference.

We take the Commission, in evaluating the exemption according to the standard we discussed, to be articulating a construction of the statutory phrase "abuse of market power." We also take that phrase to include within it Section 10101a(6)'s reasonable rate policy. We recognize that "considerable weight should be accorded to an [agency's] construction of a statutory scheme it is entrusted to administer[.]" *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* —— U.S. ——, ——, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). This is especially so where the agency is assigned to formulate a policy accommodating competing policies or interests. But there are limits to our deference. "If [the agency's] notice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.,* —— U.S. at ——, 104 S.Ct. at 2783, *quoting United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961). Here we admit that the Commission has substantial discretion as to how to carry out Congress' instruction concerning the accommodation of shipper and rail carrier interests; but wherever the bounds of its discretion are, we have no doubt that the agency's accommodation, as announced and applied in this case, "is not one that Congress would have sanctioned." Because of the newness and complexity of the statutory scheme, and because the agency has given us little help in interpreting the statute,[23] we will concentrate on

only what we feel is the most obvious flaw in the agency's position.

The legislative history of the Staggers Act is filled with references to the need to reduce rail regulation, and two reasons were repeatedly cited: regulations had often become unnecessary for protection of shippers and the public because of the development of effective competition to rail carriage, and inefficient because they had deprived railroads of the ability to earn adequate revenues to attract the capital necessary for economic health. These concerns were what motivated Congress' deregulatory moves, and the record and legislation are filled with references to these concerns both as the reasons for deregulation *and as the limits of deregulation.*

This can easily be seen in the wording of Section 10101a(6) which adopts a policy of affirmatively seeking maintenance of reasonable rates (1) "where there is an absence of effective competition," and (2) "where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital." But the same interplay of concerns can be seen throughout the structure of rate regulation in the Act, a structure we will briefly summarize.

■ Most of the rate provisions that seek to assure carrier freedom do so in the name of either effective competition or carrier revenue needs. Thus ICC has no jurisdiction to find a rate unreasonable unless it first finds that the carrier has "market dominance," 49 U.S.C. § 10709(c) (1982), a term defined as "an absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies." *Id.* § 10709(a). Jurisdiction was further limit-

---

**23.** Although the agency announced a standard concerning the "abuse of market power" provision, it did little to explain, iu terms of the statute's language, structure, or history, why the concerns for protecting shippers from carrier monopoly power were met by that standard. In light of this absence of explanation, we note "that the limit placed on the judicial role by an agency's interpretation of a statute 'assumes an adequately articulated administrative decision interpreting the relevant statutory law within a

range of reasonableness.'" *Northern Colorado Water Conservancy District v. FERC,* 730 F.2d 1509, 1517 (D.C.Cir.1984), *quoting Obremski v. OPM,* 699 F.2d 1263, 1269 (D.C.Cir.1983); *see also FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981) ("the thoroughness, validity, and consistency of an agency's reasoning are factors that bear upon the amount of deference to be given an agency's ruling").

ed on the basis of a carrier's revenue needs. The Act established a presumption of no market dominance where a carrier's revenues from the rate would exceed its variable costs by less than a designated percentage. *Id.* § 10709(d). Even if a carrier is found to be market dominant, there are congressionally provided for zones of rate flexibility based, once again, on revenue adequacy. Within them rates can be increased if a carrier's revenues are found to be inadequate. *Id.* § 10707a. *See generally Arkansas Power & Light Co. v. ICC,* 725 F.2d 716, 719 (D.C.Cir.1984).

These provisions mirror ICC's traditional justifications for allowing carriers with market power some degree of price discrimination against captive shippers. Use of market power is justified where needed for revenue adequacy.

> The theory of differential pricing is that rates on some rail services must be set above full cost to compensate for services on which railroads are required to price below full cost to remain competitive.

*Id.* at 718 n. 3; *see also San Antonio, Texas v. United States,* 631 F.2d 831, 852 (D.C.Cir.1980); *Houston Lighting & Power Co. v. United States,* 606 F.2d 1131, 1148 (D.C.Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980).

The statutory scheme's link between revenue needs and rate freedom also, however, serves to limit the rate freedom of rail carriers with market power. As the Conference Report explained, "When the industry is earning revenues which are adequate, it is appropriate for the Commission to have the authority to review rate increases more carefully." H.R.Conf.Rep. No. 96–1430, *supra,* at 91. Concern for limiting the rate freedom of carriers with market dominance also appears in the Long-Cannon Amendment to the Staggers Act, which directs ICC to consider, in determining whether to investigate certain rates,

> (i) the amount of traffic which is transported at revenues which do not contribute to going concern value and efforts made to minimize such traffic; [and]
>
> (ii) the amount of traffic which contributes only marginally to fixed costs and the extent to which, if any, rates on such traffic can be changed to maximize the revenues from such traffic[.]

49 U.S.C. § 10707a(e)(2)(B) (1982). The same factors are to be considered in rate reasonableness determinations. *Id.* § 10707a(e)(2)(C). The underlying logic of these instructions is that monopolistic discrimination should not be used to generate funds that could more efficiently and equitably be recovered elsewhere. The provision certainly assumes that the degree to which a monopolistic carrier will be able to extract rents from a captive shipper will be in some way limited by the carrier's revenue needs.

> The drafters * * * were primarily concerned about shippers of coal and other so-called "captive" shippers, and the amendment sought to assure that rate flexibility would not result in such shippers bearing a disproportionate share of responsibility for the needed improvement in the railroads' financial position. * * *

*Arkansas Power & Light Co.,* 365 ICC 983, 988 (1982).[24]

Elsewhere in Section 10707a the idea that revenue needs were not only a justification for rate flexibility but also a limit on monopolistic pricing was made even clearer. In considering challenges to the reasonableness of certain authorized rate increases, the Commission was ordered to "give due consideration to whether the carrier proposing the rate increase has attained

---

**24.** Just as the drafters were concerned with such equitable concerns regarding captive shippers, they were also concerned with disproportionately burdening, as a class, the shippers of any particular captive commodity. Thus the Act requires rate reasonableness determinations to include consideration of "the carrier's mix of rail traffic to determine whether one commodity is paying an unreasonable share of the carrier's overall revenues." 49 U.S.C. § 10707a(e)(2)(C)(iii) (1982).

adequate revenues, * * * *giving regard to preventing a carrier with adequate revenues from realizing excessive profits on the traffic involved * * *."* 49 U.S.C. § 10707a(e)(1) (emphasis added). Indeed, the Conference Report expresses an even stronger concern for monopolistic rail carriers extracting "excessive profits" when it declares that "[t]his language is not intended to imply that excessive profits for inadequate revenue carriers are reasonable." H.R.Conf.Rep. No. 96–1430, *supra,* at 94.

■ The rate reasonableness provision of Section 10101a(6) and the "abuse of market power" provision of Section 10505(a)(2)(B) should be read as reflecting the policies of the statutory scheme of which they are a part. It is unreasonable to view a statutory scheme that allows shippers to complain that a market dominant carrier is charging rates that unnecessarily generate excessive profits as being indifferent concerning the distribution of economic rents between monopolistic carriers and their captive shippers. Similarly, such an indifference seems incompatible with a scheme that allows a shipper to complain that its higher rate is unjustified because necessary carrier revenues could be more equitably generated elsewhere on the carrier's system. Protecting the revenues of shippers who face carriers with market power was an essential goal, though not the only goal, of the compromise that produced the Staggers Act.

■ ICC rested its standard, in part, on Section 10101a(1) of the rail transportation policy, which speaks of establishing reasonable rates "to the maximum extent possible" through reliance on "competition and the demand for services." *See Decision, supra,* 367 ICC at 587. But this must be read in conformity with the other provisions and policies of the Act. Though competitive forces may exist and somewhat constrain railroad power, when they nevertheless do not rise to the level of "effective competition" ICC must explain why reliance on them is sufficient to protect those

interests of shippers protected in the Act and alluded to in the policy declarations of Sections 10101a(6) and 10505(a)(2)(B). The standard that it put forth to do this here was not a reasonable one.

■ ICC also made reference to the policy of promoting railroad revenue adequacy. *See id.* at 587–588. But it saw this duty as the equivalent of maximizing railroad revenue. Again, this fails to accept that the Act was a compromise, recognizing shippers' as well as carriers' interests. It here sought to maximize railroad revenue with no reference to the actual revenue needs of the carriers involved or the size of the revenue gains they would likely receive from the exemption, or the degree to which needed revenue gains would be disproportionately subsidized by one group.

The only protection that ICC recognized as a legal duty to provide shippers was to assure that rail rates would not prevent shippers' full cost recovery and would not totally exclude them from the division of economic rents. This was unreasonable and accordingly it is a basis for vacating the exemption.

E. *The Importance of Geographic, Intramodal, and Intermodal Competition*

■ Much of the debate in the briefs and at oral argument focused on the Commission's adoption of certain data to determine that significant geographic, intramodal, and intermodal competition would constrain railroad behavior. We discussed this in detail in Part II *supra.* We have not, however, reached specific conclusions on these challenges. We can instead, for a number of reasons, generally reject the Commission's assertion that these competitive factors justify the exemption.

First, the legal importance that the Commission attributed to these factors is not clear. Although the Commission repeatedly referred to these factors as substantial restraints on railroad behavior that made regulation unnecessary, it did not find that, as a result, the railroads lacked market power. Moreover, within the legal stan-

dard used by the Commission these factors play a minimal role. The exemption is justified, said the Commission, so long as production is not reduced and some economic rents go to shippers. In its view production would not decline because of the world price cap and the self-interest of the price-discriminating monopolist, so the only significance of the other competitive factors would be to determine the division of rents between shippers and carriers. It is uncontroversial that *some* rents will go to shippers, and above that level, the Commission seemed to believe, the distribution is legally unimportant. Thus the legal importance of these competitive factors would be minimal in spite of the Commission's repeated references to them.

One might argue, however, that when the Commission discussed the standard on which the exemption was based, it was doing so within the understanding that the division of rents would, because of these competitive factors, equal some undisclosed balance that would constitute a condition of reasonable rates and nonabuse of market power. Indeed, the Commission repeatedly referred to these factors when it asserted this conclusion. Except for its discussion of the standard we have rejected, however, the Commission never attempted to explain in nonconclusory terms how much competition was necessary, or what condition would constitute one of reasonable rates and nonabuse of market power. Thus such an argument cannot save the exemption. An agency cannot hide the standards under which it operates, for we are unable to evaluate whether its reasoning meets the reasoned decisionmaking requirement unless we know against what standards its factual findings have been judged. *See Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 596 (D.C.Cir. 1971).

### CONCLUSION

As we have discussed, the Commission's opinion predicts a pricing regime in which there will not be an absence of market power with respect to shippers. Indeed, the regime is premised on the railroads' use of market power. Nevertheless, the Commission predicts that railroad behavior will not constitute "abuse of market power," as it understands the phrase. We have found the Commission's understanding of that statutory phrase to be unreasonable in that it largely ignores the protections Congress meant to guarantee to shippers. We thus hold the Commission's grant of the exemption petition to have been not in accordance with law. We vacate the Commission's decision and order, and we remand the case to the Commission for any further proceedings that may be appropriate.

*So ordered.*