787 F.2d 616
 252 U.S.App.D.C. 60
 ILLINOIS COMMERCE COMMISSION and Patrick W. Simmons, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Association of American Railroads, Illinois Central Gulf
Railroad Company, Intervenors.
The COMMISSIONER OF TRANSPORTATION OF the STATE OF NEW YORK,
Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
People of the State of California, et al., Association of
American Railroads, Intervenors.
 Nos. 83-1836, 83-1868.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued October 19, 1984.
Decided April 4, 1986.
As Amended April 4, 1986.
 
 On Petition for Review of Orders of the Interstate Commerce commission.
 Gordon P. MacDougall, and James E. Weging, for petitioners in No. 83-1836.
 William J. Dwyer, for petitioner in No. 83-1868.
 Louis Mackall, Atty., I.C.C., with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, John Broadley, Gen. Counsel, I.C.C., at the time the brief was filed, Ellen D. Hanson, Associate Gen. Counsel, I.C.C., Barry Grossman and Edward T. Hand, Attys., Dept. of Justice, for respondents.
 James I. Collier, Jr., for intervenor Ass'n of American Railroads.
 Howard D. Koontz, for intervenor, Illinois Cent. Gulf R. Co.
 Before ROBINSON, Chief Judge, and WRIGHT and WALD, Circuit Judges.
 Opinion for the Court filed by Chief Judge ROBINSON.
 SPOTTSWOOD W. ROBINSON, III, Chief Judge:
 
 
 1
 These petitions for review challenge an order of the Interstate Commerce Commission deregulating abandonments of "out of service" rail lines.[1] Purportedly exercising authority conferred by the Staggers Rail Act of 1980,[2] the Commission exempted segments of line that have not been used for at least two years, and those upon which no traffic has originated or terminated for a like period,[3] from compliance with statutory standards and procedures that otherwise would govern abandonments.[4] Petitioners[5] contest this action, contending that the exemption is arbitrary and unsupported by essential findings. Perceiving merit in some of petitioners' arguments, we remand these cases to the Commission for further consideration.
 
 I. THE BACKGROUND
 A. The Statutory Framework
 
 2
 The Staggers Act erects a comprehensive scheme of standards and procedures for abandonments of rail lines. Under its provisions, a railroad subject to the Commission's jurisdiction[6] may abandon a segment of line only if the Commission finds that the present or future public convenience and necessity will be served thereby.[7] The railroad must apply to the Commission for a certificate of abandonment[8] and widely publicize the proposal. It must notify states directly affected and shippers who made significant use of the line during the preceding twelve months,[9] and it must publish a notice in local newspapers and post it in stations along the line.[10] The railroad must also maintain a complete diagram of its transportation system depicting lines projected for or potentially subject to abandonment, and must submit to the Commission and publish any amendments affecting its accuracy.[11] When an abandonment is opposed by a state, political subdivision, or significant user of the line during the previous twelve months, a certificate of abandonment ordinarily will not issue unless the line was described in the diagram or an amendment at least four months prior to the application.[12]
 
 
 3
 If the Commission receives no protest within 30 days of the railroad's application, it must find that the soughtafter abandonment is consistent with the public convenience and necessity, and issue a certificate of abandonment.[13] If there is a timely protest, the Commission must then determine whether an investigation is needed.[14] Time limits are set for completion of any investigation, rendition of the Commission's decision without or after investigation, and issuance of any certificate of abandonment.[15]
 
 
 4
 A Commission finding that the proposed abandonment fosters the public convenience and necessity does not, however, lead inexorably to a certificate of abandonment. Elaborate provision is made for offers to purchase the line or financially subsidize its operation as means of avoiding an actual abandonment.[16] The Commission must publish its finding in the Federal Register[17] and the railroad must promptly furnish to anyone potentially interested a variety of information enabling calculation of an adequate purchase price or subsidy.[18] Should a timely offer[19] meeting a statutory formula be made by a financially responsible person,[20] issuance of a certificate of abandonment is postponed pending negotiation of an agreement by the parties[21] or establishment by the Commission of the conditions of sale or subsidy.[22] A firm sale of the line assures its operation for at least two years.[23]
 
 
 5
 It is from adherence to this statutory scheme that the Commission, invoking Section 10505 of the Staggers Act, has exempted out-of-service lines. With exceptions not pertinent here,[24] Section 10505(a) requires the Commission to exempt a transaction from the operation of a provision governing interstate rail transportation if its application is not essential to effectuation of the rail transportation policy delineated in Section 10101a,[25] and if either the transaction is of limited scope or application of the statutory provision is not needed to protect shippers from an abuse of market power.[26] We now turn to the proceeding from which the exemption emanated to ascertain whether the Commission complied with these mandates.
 
 B. The Administrative Proceeding
 
 6
 The Commission issued a notice proposing a rule exempting from regulation abandonments of rail lines that have been out of service for two years or more.[27] The notice explained that the Commission had recently granted a series of case-by-case exemptions enabling abandonment of lines unused for extended periods,[28] and that, because those lines had handled no traffic for many years, it had in no instance found any evident need for the line or any adverse effect on shippers, interstate commerce, or the rail transportation policy.[29] On the basis of this experience, the Commission surmised that a blanket exemption of out-of-service lines might be appropriate.[30]
 
 
 7
 The notice of the upcoming rulemaking proceeding stated that "[p]rior approval of abandonment of out of service rail lines does not appear to be necessary to carry out the goals of the rail transportation policy outlined in Section 10101a."[31] An "out-of-service line" was defined as one over which no local or overhead traffic[32] has moved for two years, but commenters were asked to discuss whether the term should also include lines carrying overhead traffic that could be rerouted over another line of the carrier.[33] The notice further stated that "exempting the transactions may facilitate at least one of the policy objectives of Section 10101a--to minimize the need for regulatory control and to require expeditious decisions when regulation is necessary."[34] The notice declared that the exemption would not adversely affect shippers, but would protect rail labor and save railroads the expense of preparing applications and the Commission the expense of processing them.[35]
 
 
 8
 The Commission deemed the proposed exemption in keeping with Section 10505(a)' § requirement of either a transaction of limited scope or an absence of need for application of the statutory abandonment provisions to protect shippers from an abuse of market power. The Commission reasoned that the exemption would have no operational or competitive impact because it would simply allow immediate de jure recognition of an already-existing de facto discontinuance of service.[36] The Commission considered regulation unnecessary to protect shippers from market-power abuses because any line eligible for exemption would have lain unused for at least two years.[37]
 
 
 9
 The Commission envisioned an abbreviated procedure for effectuating an exempt abandonment. To begin with, the railroad would notify the public service commission or equivalent agency in each state through which the line proposed for abandonment runs.[38] One week prior to actual abandonment, the railroad would notify the Commission,[39] which then would publish notice of the abandonment in the Federal Register,[40] and any petition for revocation of the exemption would become due within 15 days thereafter.[41] The Commission anticipated that, because of the abandoned line's two years out of service, the railroad would receive no offers to purchase or subsidize the line,[42] and suggested that anyone with a continuing transportation interest in the line could petition for revocation of the exemption.[43]
 
 
 10
 The Commission received 44 comments in response to the notice.[44] The railroads generally supported the exemption and favored broadening it to include lines carrying only overhead traffic,[45] but feared that the revocation procedure might be available even after the tracks had been physically removed.[46] Opponents of the exemption--primarily states, shippers, and their representatives--protested on a number of grounds.[47] They expressed apprehension that railroads could and would use embargoes[48] to obtain out-of-service status that would permit them to invoke the exemption.[49] They further argued that Section 10505 does not authorize exemption of a class of transactions, but only exemption of individual transactions,[50] and they objected to expansion of the definition of "out of service" to include lines handling overhead traffic.[51] They also contended that the proposed exemption procedures provided insufficient notice,[52] that the Commission improperly relied on past instances in which exemptions were granted on a case-by-case basis,[53] and that the Commission had not supported its belief that the exemption would not significantly affect the human environment or energy resources.[54]
 
 
 11
 Ultimately, the Commission issued its decision and order in favor of an exemption.[55] The Commission reiterated its earlier view that the exemption would comport with the requirements of Section 10505(a).[56] It adopted as findings the factual assumptions advanced in the notice of rulemaking, but altered the exemption somewhat in an effort to alleviate problems discussed in the comments.[57] The Commission decided that out-of-service lines should "include those lines where there may still be overhead traffic, so long as there has been no traffic originating or terminating on the line for at least 2 years."[58] The reason assigned for this conclusion was that routing of overhead traffic over a given line may be a "matter of business efficiency,"[59] and that "[o]verhead traffic routing is a matter of managerial discretion and is not of controlling importance in most abandonment proceedings."[60] The Commission further asserted that the change in definition of "out of service" would not affect shippers because they would continue to receive rail service.[61]
 
 II. THE RAIL TRANSPORTATION POLICY
 
 12
 In reviewing the Commission's exemption decisions, our task is to determine whether its action was arbitrary, capricious, an abuse of discretion or otherwise contrary to law.[62] While the scope of review undoubtedly is narrow,[63] we must satisfy ourselves that the Commission "consider[ed] all critical aspects of the problems before it, and ... articulate[d] a reasoned explanation for its action, including 'a rational connection between the facts found and the choice made.' "[64] We now examine the Commission's decision in light of each of petitioners' three principal challenges to the exemption of out-of-service lines[65] to determine whether it withstands an application of these principles.
 
 
 13
 One of the two findings that Section 10505(a) makes a prerequisite to an exemption from operation of a provision of the Staggers Act is that "application of [the] provision ... is not necessary to carry out the transportation policy of section 10101a...."[66] The latter section specifies the fifteen facets of "the policy of the United States Government" "[i]n regulating the railroad industry."[67] Petitioners insist that the Commission did not accord the rail transportation policy its important role when it undertook to exempt abandonments of out-of-service lines from the regulatory provisions of the Act.
 
 
 14
 The rail transportation policy, this court has said, "must guide the [Commission] in all its decisions."[68] It is the Commission's responsibility to make sure that application of the statutory provision from which a transaction is exempted is unnecessary to effectuation of that policy.[69] This does not necessarily mean that the Commission must address each and every one of the policy's fifteen components,[70] for some may be completely unrelated to the exemption.[71] It does mean, however, that the Commission must consider all aspects of the policy bearing on the propriety of the exemption[72] and must supply an acceptable rationale therefor.[73] Only by doing so can the Commission avoid the taint of arbitrariness.[74]
 
 
 15
 In the notice of rulemaking on the proposed exemption, the Commission stated that "[p]rior approval of abandonment of out of service rail lines does not appear to be necessary to carry out the goals of the rail transportation policy."[75] The Commission predicted that, rather, the exemption might well facilitate achievement of one of the policy objectives: expeditious decisionmaking when regulation is necessary and minimization of the need for federal regulatory control.[76] The notice also referred to cases in which the Commission had concluded that exemption of an abandonment from the statutory strictures would not affect the transportation policy because the involved rail service had been discontinued for several years.[77]
 
 
 16
 Comments submitted in response to the notice prompted the Commission to stand by its preliminary estimate that compliance with the statutory abandonment procedures is not necessary to carry out the goals of the rail transportation policy after the rail lines in question have gone out of service.[78] The Commission found support in the comments for its earlier view that the exemption would minimize the occasion for regulatory control and foster expeditious decisions when regulation is necessary.[79] The Commission also found that two additional policy objectives would be served: reduction of regulatory barriers to entry into and exit from the industry,[80] and promotion of energy conservation.[81]
 
 
 17
 Petitioners assert that the findings on the two policy goals last mentioned are irrational, and that the Commission failed to take other relevant policy criteria into account.[82] We sustain the Commission's conclusion on barriers to entry and exit, but agree that the Commission did not adequately support its determination on energy conservation. We also agree that the Commission erred in failing to address other relevant aspects of the rail transportation policy.
 
 A. Facilitation of Entry and Exit
 
 18
 Petitioners offer separate arguments against the finding that the exemption will facilitate entry to and exit from the rail industry. The Illinois petitioners contend that the Act contemplates exit from the industry as a whole, and not simply from the operation of a particular line.[83] Petitioner New York points to the unavailability of statutory forced sale of abandoned lines to potential new entrants[84] under the exemption, and urges that this offsets whatever exits the exemption might make easier.[85]
 
 
 19
 Neither of these arguments persuades us that the Commission's finding was irrational. While the Act may refer to exit from the industry as a whole, abandonment of a particular line lessens the railroad's presence and thus facilitates its complete withdrawal from the industry. The inference that a simpler process of achieving an abandonment lowers regulatory barriers to both entry and exit seems reasonable.
 
 
 20
 Nor does the demise of the forced-sale option in exempted abandonment of out-of-service lines render the Commission's determination arbitrary. The parties have focused on whether the opportunity to acquire an abandoned line at a forced sale is available to prospective purchasers when the line is out of service;[86] they do not consider whether elimination of the forced sale amounts to interposition of an obstacle. We need merely observe that removal of a mechanism that might facilitate entry into the industry, such as the forced sale, does not equate to erection of a regulatory barrier to entry. Nor does it dissipate the Commission's finding that the exemption will reduce the regulatory barriers to exit. At least overall, the Commission's outcome accords with the policy of deregulation pervading the Staggers Act.[87]
 
 B. Energy Conservation
 
 21
 Petitioners also insist that the Commission's finding that the exemption will promote energy conservation is without support in the record.[88] With this we thoroughly agree. Comments by the Commission's Section on Energy and Environment addressed only the question whether the Commission should condition resort to the exemption on compliance with environmental factors.[89] Neither this nor any other comment submitted to the Commission hints that the exemption will contribute to any conservation of energy.[90] A finding utterly lacking in record support is arbitrary.[91]
 
 C. Other Policy Objectives
 
 22
 In addition to their attacks on specific findings by the Commission respecting the rail transportation policy, petitioners argue that other facets of the policy are relevant to propriety of the exemption but were not considered by the Commission. While, as we have said, the Commission need not address every aspect of the policy,[92] it must make clear that it weighed each component that is pertinent.[93]
 
 
 23
 First, petitioners contend that abandonment of a line bearing overhead traffic will result in a rerouting of that traffic, which will seriously affect the reasonableness of the rates therefor in the absence of competition[94]--in contravention of the sixth objective of the rail transportation policy.[95] Several of the comments submitted anticipated such an adverse impact on rates.[96] The Commission asserts that the railroads need not exercise their option to use a short-line distance for purposes of ratemaking, and thus may raise their rates even absent the exemption.[97] The short answer to this argument is that the rates as raised must nonetheless remain reasonable, and since one of the aims of the rail transportation policy is maintenance of reasonable rates where there is an absence of competition, the inquiry on appropriateness of the exemption should have extended to whether abandonments of out-of-service lines will expose shippers to excessive rates.[98]
 
 
 24
 Despite its receipt of comments urging a connection between the proposed exemption and the level of rates, the Commission chose to remain silent on whether application of the statutory abandonment procedures is essential to maintenance of reasonable rates.[99] The exemption adopted by the Commission skirts the analysis of the public convenience and necessity that those procedures demand, including the focus on costs to shippers. The Commission should have determined whether adherence to the statutory procedures is necessary to achieve the goal of rate reasonableness set by the rail transportation policy.[100]
 
 
 25
 Petitioners further argue that the exemption contravenes the policy by not ensuring "the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense."[101] Although this policy objective is plainly relevant to suitability of the exemption, and although comments received by the Commission clearly referred to considerations implicating its criteria,[102] the Commission's decision does not reflect adequate attention to them. The Commission now advances the twin non sequiturs that it discussed the alternative of acquiring an abandoned line through private negotiation or the feeder development program,[103] and that the primary commenter on the point, the Department of Defense, did not seek judicial review.[104] Not only are these post hoc rationalizations of counsel legally unacceptable,[105] but neither responds to the concerns expressed in the comments[106] nor constitutes due consideration of the impact of the exemption on this aspect of the rail transportation policy.
 
 
 26
 Finally, petitioners assert that the Commission should have considered whether application of the statutory system-diagram requirements[107] and utilization of the statutory financial-assistance programs[108] are necessary to meet the policy objective of cooperation "with the States on transportation matters to assure that intrastate regulatory jurisdiction is exercised in accordance with the standards established" by the Act.[109] The Commission contends that this expression of policy concerns only state regulation of intrastate rail operations, while the exemption will affect only lines that are part of the interstate rail system.[110] The Commission thus assumes that because the states would not regulate the lines exempted, application of the statutory abandonment procedures could not in any way promote cooperation with the states to assure exercises of intrastate regulatory jurisdiction consistent with the statutory standards.
 
 
 27
 It seems obvious, however, that any sort of cooperation with the states on transportation matters is calculated to increase the probability that the states will reciprocate by continuing to observe federal standards. More importantly, and contrary to the Commission's assertion, the rail transportation policy on cooperation with the states is not restricted "by its terms" to situations where the states are applying federal standards,[111] but extends unqualifiedly to "transportation matters."[112] We think the Commission should have considered the many comments submitted by the states decrying the lack of notice of proposed abandonments and the unavailability of forced sales under the exemption.[113] From aught that appears, the Commission paid no heed to these comments.
 
 
 28
 The Commission's decision thus falls short of the treatment required by the first prong of Section 10505(a); it has not made all of the findings prerequisite to a determination that application of the statutory provisions on abandonment is unnecessary to carry out the rail transportation policy. The Commission did not support its conclusion, offered in support of the exemption, that the exemption would encourage and promote energy conservation.[114] Moreover, the Commission did not undertake findings in connection with other aspects of the policy that are relevant to the appropriateness of the exemption of out-of-service lines.[115] Accordingly, we must remand this case to the Commission for suitable findings in these respects.
 
 
 29
 III. LIMITED SCOPE AND PROTECTION FROM ABUSE OF MARKET POWER
 
 
 30
 The second of the two phases of the Section 10505(a) analysis is an additional prerequisite to an exemption from operation of a provision of the Staggers Act. This requirement is cast in the alternative: either the transaction or service to be exempted must be of limited scope,[116] or application of the statutory provision must be unnecessary to protect shippers from abuses of market power.[117] The Commission found that the scope of the exemption will be limited because abandonment of lines out of service for at least two years "has no competitive or operational impact, because it will usually pertain to short-line segments with no shippers."[118] The Commission further found that two years of nonuse of a line proves that regulation is not needed to safeguard shippers against market-power abuses.[119]
 
 
 31
 The Illinois petitioners launch two principal attacks on the Commission's response to this mandate. They first contend that the two-year period during which a line must be out of service before it can qualify for the exemption is too brief to assure against abuses of market power to the detriment of shippers.[120] We uphold the Commission in this regard. They also argue that the Commission erred in failing to assess the effect of its change in definition of "out of service line"[121] on the issues of limited scope and market-power abuse. We agree on this point and accordingly direct the Commission to reexamine those issues on remand.
 
 A. The Two-Year Period
 
 32
 The Illinois petitioners assert that the Commission acted arbitrarily when it determined that two years is long enough for a line to be out of service to assure that no subterfuge lurked behind the discontinuance of service.[122] In its notice of rulemaking, the Commission had indicated satisfaction that the two-year period would suffice for that purpose. The notice cited decisions in which the Commission, in granting case-by-case exemptions, had found that since no traffic had been handled on the involved lines for several years, there was no evident need for the lines, and consequently that abandonment would not adversely affect shippers.[123] Moreover, the Commission declared, abandonments of this sort are so limited in scope that they usually exert "no impact on interstate commerce,"[124] but merely "allow[ ] the rail carrier to dispose of track and land for lines that [have] not been operated or maintained for many years."[125]
 
 
 33
 As the Illinois petitioners observe,[126] the decisions referred to in the Commission's notice of rulemaking dealt with lines that had been out of service for much longer than two years.[127] These petitioners further argue that additional cases upon which the Commission relied in its decision do not support the two-year period.[128]
 
 
 34
 The Commission's decision refers to only one instance antedating issuance of the notice of rulemaking in which a line out of service for less than two years had been exempted from the statutory abandonment procedures.[129] The Commission adverted to three other exemptions, granted after promulgation of the notice, involving lines that had been out of service for periods ranging from two to five years.[130] We agree that the examples cited in the notice and the decision, standing alone, do not fully establish that a blanket exception of lines out of service for as little as two years is necessarily accompanied by a reasonable assurance that shippers are shielded from abuses of market power.
 
 
 35
 The Commission, however, did not rest merely upon its prior exemption adjudications; it responded to concerns about this potential danger in several additional and more positive ways. To augment the safeguards provided by existing statutory complaint procedures,[131] the Commission amended its exempting regulation to make the exemption unavailable for any line targeted in a formal complaint before the Commission that either is filed within the two-year out-of-service period or is awaiting decision when an exemption is sought.[132] Later, when the Commission considered petitions to reconsider its rulemaking decision,[133] it extended ineligibility for the exemption to include lines subject to state or local government complaints to the Commission.[134] Even more recently, the Commission broadened the prohibition on exemptions to encompass lines complained of in federal district courts.[135] In light of these strictures, and the Commission's apparent willingness to monitor for and rectify post-exemption market-power abuses,[136] we cannot upset the Commission's judgment that the two-year period of out-of-service status affords sufficient protection to shippers.[137]
 
 
 36
 B. Definition of "Out-of-Service Line"
 
 
 37
 The exemption that the Commission ultimately adopted departed in an important respect from the one it originally proposed. In its decision, the Commission enlarged the definition of "out-of-service line" from a line carrying no traffic at all to include additionally a line over which overhead traffic travels.[138] The Commission neglected, however, to assess the adequacy of its findings to support the exemption as correspondingly enlarged, and thereby greviously erred.
 
 
 38
 In its notice of rulemaking, the Commission stated its belief that the exemption--then envisioned for a line devoid for two years of any traffic at all--would have no operational impact and thus would be limited in scope, and would not affect shippers because none would have used the line for at least two years.[139] In its decision, however, the Commission, notwithstanding expansion of its definition to also take in lines conducting overhead traffic only, reiterated the same rationale:
 
 
 39
 Several parties question whether this exemption is of limited scope. However, they present no factual data to refute our finding based on analysis of prior exemptions, that abandonment of lines out of service for at least 2 years has no competitive or operational impact, because it will usually pertain to short-line segments with no shippers. Further, regulation is not needed to protect shippers from the abuse of market power, because the lines have been out of service for at least 2 years.[140]
 
 
 40
 This explanation lends no support whatsoever to the exemption insofar as it pertains to lines accommodating overhead traffic; on the contrary, it exposes the decisional flaw attributable to the definitional change. Such lines are not "segments with no shippers," nor have they been "out of service for shippers" whose shipments comprise the overhead traffic. Nor is it true that the exemption "would merely allow carriers to dispose of track and land for lines that had not been operated or maintained," as the Commission was later to say.[141] The lines obviously have been operated for overhead traffic and presumably have been maintained for that purpose. Resultantly, it does not automatically follow that an exemption of these lines from the statutory abandonment procedures "is of limited scope" or without any "competitive or operational effect," requiring no "regulation ... to protect shippers from the abuse of market power." The number of affected overhead shippers in a given situation may conceivably be vast rather than trivial, and they may be susceptible rather than immune to "competitive or operational impact" and "abuse of market power." The Commission's rationale simply does not sustain the exemption for overhead lines.
 
 
 41
 In expanding the definition to encompass lines over which only overhead traffic moves, the Commission declared that assignment of "overhead traffic [to] a given route [is] a matter of business efficiency ..., to better use crews, equipment and maintenance of the line.... Overhead traffic routing is a matter of managerial discretion and is not of controlling importance in most abandonment proceedings."[142] We first note that whether overhead routing is a prerogative of railroad management is irrelevant to the Section 10505(a)(2) inquiries, which relate to the scope of the transaction exempted and the danger of abuses of market power.[143] Nor does the fact that, in a statutory abandonment proceeding, the determination on the public convenience and necessity may accord little weight to overhead traffic on the line obviate the need, in the Commission's evaluation of the proposed exemption under Section 10505(a)(2), to take into account and justify the greater breadth of the exemption wrought by the expansion of the concept of "out of service." Section 10505(a)(2) demands exploration, not into the public convenience and necessity, but into the scope of the transaction to be exempted and the potential for abuses of market power. The much broader definition of "out of service" upon which the Commission eventually settled implicates and exacerbates both of these concerns.[144]
 
 
 42
 While the Commission permissibly drew upon its prior exemption decisions for part of its justification for the two-year period of nonuse of the line,[145] it erred in relying upon prior abandonment proceedings as support for the conclusion that the "out-of-service" definition was appropriate. The analysis dictated by Section 10505(a)(2) for exemptions, we repeat, differs radically from the assessment of the public convenience and necessity statutorily mandated for abandonments. We hold that Section 10505(a)(2) required the Commission to reevaluate the impact of the exemption once it was extended to lines over which overhead traffic is traveling and from which an abandonment would necessitate rerouting of the traffic to some other line or lines. Lacking that, the Commission has failed to articulate a reasoned explanation for its action.[146]
 
 IV. PROTECTION OF EMPLOYEE INTERESTS
 
 43
 Section 10505(g) provides that the Commission may not exercise its exemption authority to relieve a carrier of its obligation to protect the interests of employees.[147] The exemption regulation under scrutiny in terms requires only that railroads seeking exemption include with their notices of intent to abandon information on the level of labor protection to be provided.[148] However, the notice of rulemaking indicated that the standard labor conditions adopted by the Commission in Oregon Short Line Rail Co.--Abandonment--Goshen[149] would apply to carriers utilizing the exemption,[150] and the Commission's decision acknowledges that it adopted the exemption as proposed in the notice of rulemaking with only specified changes.[151] The Commission does not dispute the resulting conclusion that the exemption thus incorporates the Oregon Short Line employee protections.
 
 
 44
 The Illinois petitioners contend, quite correctly,[152] that those protections constitute only a minimum that the Commission must expand if the circumstances so require.[153] They assert that the exemption regulation does not provide any adequate procedure by which labor can obtain Commission consideration of arguments that a particular case warrants a higher level of protection.[154]
 
 
 45
 It seems that use of either of two possible vehicles might summon the Commission to address a labor-protection issue. One is a petition for reconsideration of a Commission decision, which would ensure a determination of the issue prior to effectuation of an abandonment; the other is a petition for revocation of an exemption, which would not afford that guaranty. The parties are in hopeless disagreement on actual availability of those mechanisms,[155] and a chameleon-like stance of the Commission on the question[156] makes any present effort toward its resolution a risky if not a fruitless undertaking.[157]
 
 
 46
 In this state of grave uncertainty as to a procedure available to challenge the sufficiency of the Oregon Short Line protections, we cannot at this juncture address the issue of its adequacy. Instead, we direct the Commission to ascertain, on remand, the procedure that will assure ample consideration of the employee-protection issue and to clarify the manner in which employee may invoke it.V. CONCLUSION
 
 
 47
 The Staggers Act greatly enlarged the authority of the Commission to exempt railroads from regulation. Accompanying the power thus entrusted, however, are duties that the Commission must scrupulously perform in the course of any decision to create an exemption. Undoubtedly the Commission has endeavored to fulfill these responsibilities, but it did not complete the exacting analytical process indispensable to a soundly reasoned decision. The Commission failed adequately to consider whether the challenged exemption would thwart relevant aspects of the rail transportation policy; it assigned a new definition to "out-of-service lines" without ascertaining whether it was sufficiently supported by its findings; and it has yet to show that it affords affected employees of abandoned rail lines a fair opportunity to voice their concerns respecting protective labor conditions. To the end that these shortcomings may be rectified, we vacate the order under review and remand the case to the Commission for further proceedings consistent with this opinion.
 
 
 48
 So ordered.
 
 
 
 [1]
 Abandonment is characterized by an intent to discontinue, either permanently or indefinitely, transportation service over the line. Black v. ICC, 246 U.S.App.D.C. 12, 18-19, 762 F.2d 106, 112-113 (1985). Permanent abandonment enables the railroad to remove the track and dispose of the land. See Exemption of Out of Service Rail Lines, 366 I.C.C. 885 (1983)
 
 
 [2]
 Pub.L. No. 96-448, 94 Stat. 1895 (1980) (codified in scattered sections of 49 U.S.C.) (amending the Interstate Commerce Act. ch. 104, 24 Stat. 379 (1887)) (codified as amended in 49 U.S.C. subtitle IV (1982)) [each hereinafter cited as codified]
 
 
 [3]
 The term "out-of-service line," as employed by the Commission, is not a completely accurate description of the line exempted since it may serve traffic neither originating nor terminating thereon. An "out-of-service" line is, however, out of service to local traffic
 
 
 [4]
 49 C.F.R. Sec. 1152.50 (1985) sets forth the text of the exemption as amended. The amendment expanded the exemption to encompass discontinuance of service and trackage rights over rail lines out of service for two years. See Exemption of Out of Service Lines (Discontinuance of Service and Trackage Rights), 49 Fed.Reg. 17002 (1984). Separate litigation before this court concerns that expansion. Illinois Commerce Comm'n v. ICC, No. 84-1164 (D.C.Cir.) (filed Apr. 27, 1984)
 
 
 [5]
 The petitioners in No. 83-1836 are the Illinois Commerce Commission and Patrick W. Simmons, the Illinois Legislative Director for the United Transportation Union. The Commissioner of Transportation of New York is the petitioner in No. 83-1868. The Association of American Railroads has intervened in both cases, and the State of California and its Public Utilities Commission have intervened in No. 83-1868
 
 
 [6]
 The basic parameters of the Commission's jurisdiction are established by 49 U.S.C. Sec. 10501 (1982)
 
 
 [7]
 Id. Sec. 10903(a)
 
 
 [8]
 Id. Sec. 10904(a)(1)
 
 
 [9]
 Id. Sec. 10904(a)(3)
 
 
 [10]
 Id
 
 
 [11]
 Id. Sec. 10904(e)(2)
 
 
 [12]
 Id. Sec. 10904(e)(3)
 
 
 [13]
 Id. Sec. 10904(b)
 
 
 [14]
 Id. Sec. 10904(c)(1)
 
 
 [15]
 See id. Sec. 10904(c)(2), (3)
 
 
 [16]
 See id. Sec. 10905
 
 
 [17]
 Id. Sec. 10905(c)
 
 
 [18]
 Id. Sec. 10905(b)
 
 
 [19]
 See id
 
 
 [20]
 See id. Sec. 10905(d)
 
 
 [21]
 Id. Sec. 10905(d), (e)
 
 
 [22]
 Id. Sec. 10905(f)(1), (2)
 
 
 [23]
 Id. Sec. 10905(f)(4). Irrespective of receipt or consummation of an offer to purchase or subsidize, the Commission, whenever it finds that the line can serve a public purpose--for example, another form of transportation--may condition its disposal in order to make it available for that purpose. See id. Sec. 10906
 
 
 [24]
 See id. Sec. 10505(e), (g) quoted infra note 26
 
 
 [25]
 Id. Sec. 10101a, quoted infra note 67
 
 
 [26]
 Section 10505 provides:
 (a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle--
 (1) is not necessary to carry out the transportation policy of section 10101a of this title; and
 (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.
 (b) The Commission may, where appropriate, begin a proceeding under this section on its own initiative or on application by the Secretary of Transportation or an interested party.
 (c) The Commission may specify the period of time during which an exemption granted under this section is effective.
 (d) The Commission may revoke an exemption, to the extent it specifies, when it finds that application of a provision of this subtitle to the person, class, or transportation is necessary to carry out the transportation policy of section 10101a of this title.
 (e) No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11707 of this title. Nothing in this subsection or section 11707 of this title shall prevent rail carriers from offering alternative terms nor give the Commission the authority to require any specific level of rates or services based upon the provisions of section 11701 of this title.
 (f) The Commission may exercise its authority under this section to exempt transportation that is provided by a rail carrier as a part of a continuous intermodal movement.
 (g) The Commission may not exercise its authority under this section (1) to authorize intermodal ownership that is otherwise prohibited by this title, or (2) to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle.
 
 
 [27]
 Exemption of Out of Service Rail Lines, 47 Fed.Reg. 13538 (1982) (notice of rulemaking)
 
 
 [28]
 Id. at 13538-13539
 
 
 [29]
 Id. The prior exemption decisions cited by the Commission had paved the way for railroads to dispose of the track and land comprising lines that had been out of operation and without maintenance for periods ranging from ten to as long as 20 years. Id. n. 1 (citing Union Pac. R.R. & Oregon Short Line R.R., I.C.C. Finance Docket No. 29749 (Nov. 23, 1981) (10 years); Louisville & N. R.R., I.C.C. Finance Docket No. 29774 (Dec. 11, 1981), Joint Appendix (J. App.) 108 (24 years); Atchinson, T. & S.F. Ry., I.C.C. Finance Docket No. 29785 (Dec. 23, 1981), J. App. 106 (indefinite number of years) and Burlington N. R.R., I.C.C. Finance Docket No. 29817 (Feb. 10, 1982), J. App. 110 (11 years))
 
 
 [30]
 Exemption of Out of Service Rail Lines, supra note 27, 47 Fed.Reg. at 13538-13539
 
 
 [31]
 Id. at 13539
 
 
 [32]
 "Local traffic" originates or terminates at some point on the line. Brief for Illinois Petitioners at 9 n. 9. "Overhead traffic," alternately known as "bridge traffic," id. at 22, originates and terminates at points beyond the line
 
 
 [33]
 Exemption of Out of Service Rail Lines, supra note 27, 47 Fed.Reg. at 13539
 
 
 [34]
 Id
 
 
 [35]
 Id. The Commission did not explain just how this saving of costs would occur. As one commenter later pointed out,
 the expenses of abandonment applications can be avoided by filing requests for exemption as to individual abandonment transactions.... [T]he issue is not whether or not the preparation and processing of abandonment applications for out of service lines are unduly expensive and burdensome, but rather ... whether or not the preparation and processing of individual requests for exemption of such lines are unduly expensive and burdensome.
 Comments of Growmark, Inc. (filed Apr. 30, 1982) at 8-9 J. App. 143, 151-152 (emphasis in original). While the conclusion that all concerned would benefit by the exemption does not, strictly speaking, fall within the purview of the Sec. 10505 analysis, it does intertwine with several of the rail transportation policies. See, e.g., 49 U.S.C. Sec. 10101a(3), (4), (13) (1982).
 
 
 [36]
 Exemption of Out of Service Rail Lines, supra note 27, 47 Fed.Reg. at 13539
 
 
 [37]
 Id
 
 
 [38]
 Id
 
 
 [39]
 Id
 
 
 [40]
 Id
 
 
 [41]
 Id
 
 
 [42]
 Id. at 13540
 
 
 [43]
 Id
 
 
 [44]
 See J. App. 7-178
 
 
 [45]
 See, e.g., Comments of Family Lines Rail System (filed Apr. 30, 1982) at 2, J. App. 70, 72; Comments of Norfolk & Western Railway Company (filed Apr. 27, 1982) at 3, J. App. 47, 50
 
 
 [46]
 See Comments of Family Lines Rail System, supra note 45, at 3-4, J. App. 73-74
 
 
 [47]
 See Comments of California Department of Transportation (filed Apr. 23, 1982) at 1, J. App. 23; Comments of Idaho Transportation Department (filed Apr. 12, 1982), J. App. 11; Comments of Illinois and Illinois Commerce Commission (filed Apr. 30, 1982) at 4-5, J. App. 119, 123-124; Supplement to Comments of Illinois Commerce Commission (filed May 10, 1982) at 2, J. App. 177-178; Comments of Kansas Corporation Commission (filed Apr. 22, 1982) at 1-2, J. App. 14-15; Comments of Montana Citizens Freight Rate Association (filed Apr. 26, 1982), J. App. 13; Comments of Montana Department of Commerce and Montana Wheat Research and Marketing Committee (filed Apr. 30, 1982) at 4-5, J. App. 131, 135-136; Comments of Montana Farm Bureau Federation (filed Apr. 23, 1982), J. App. 26; Comments of Montana Public Service Commission (filed May 3, 1982) at 3, J. App. 156, 159; Comments of California and Public Utilities Commission of California (filed May 3, 1982) at 2, J. App. 162, 163; Statement on Behalf of Public Utility Commissioner of Oregon (filed May 5, 1982) at 2, J. App. 170, 172; Comments of Railway Labor Executives Association (filed Apr. 30, 1982) at 2-3, J. App. 112, 113-114; Comments of Patrick W. Simmons (filed Apr. 30, 1982) at 6, J. App. 89, 96; Comments of Washington Department of Transportation (filed Apr. 27, 1982) at 1, J. App. 45
 
 
 [48]
 A railroad might issue unilaterally an embargo to justify a discontinuance of service as a temporary emergency measure when it is unable to perform its duties as a common carrier. ICC v. Baltimore & A. R.R., 398 F.Supp. 454, 462 (D.Md.1975), aff'd, 537 F.2d 77 (4th Cir.), cert. denied, 429 U.S. 859, 97 S.Ct. 159, 50 L.Ed.2d 136 (1976). "Because both abandonment and embargo entail a cessation of service, the question of whether an embargo has been transmuted into an unlawful abandonment revolves largely around the length of the cessation and the intent of the railroad." Id. (citations omitted). See also ICC v. Chicago & N.W. Transp. Co., 533 F.2d 1025, 1028 (8th Cir.1976). The final regulation on exemption declared that the availability of Commission complaint and enforcement procedures, see 49 U.S.C. Sec. 11702(a)(1) (1982), would forestall potential problems with embargoes. Exemption of Out of Service Rail Lines, supra note 1, 366 I.C.C. at 887-888. Petitioners dispute this ground because it pertained only to complaints filed with the Commission and not those filed in a federal court; they claim that states and shippers traditionally resort directly to the courts when a line is unlawfully embargoed because the Commission is without power to issue an injunction. See Letter from Louis Mackall, Office of General Counsel, Interstate Commerce Commission, to George A. Fisher, Clerk, United States Court of Appeals for the District of Columbia Circuit (filed Oct. 11, 1984); Reply Brief for Illinois Petitioners at 9-10, citing City of Miami v. ICC, 669 F.2d 219, 221 n. 10 (5th Cir.1982). Since the Commission has amended the regulation to render any line subject to a complaint in a federal district court regarding cessation of service ineligible for the exemption, Exemption of Out of Service Lines (Discontinuance of Service and Trackage Rights), 50 Fed.Reg. 8335 (1985), this aspect of petitioners' challenge is now moot. See Steffel v. Thompson, 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1216 n. 10, 39 L.Ed.2d 505, 515 n. 10; Alton & So. Ry. v. International Ass'n of Machinists & Aerospace Workers, 150 U.S.App.D.C. 36, 41-42, 463 F.2d 872, 877-878 (1972); Burbank v. Twomey, 520 F.2d 744, 747-748 (7th Cir.1975)
 
 
 [49]
 See, e.g., Comments of Illinois Commerce Commission, supra note 47, at 4-5, J. App. 123-124; Comments of Montana Department of Commerce and Montana Wheat Research and Marketing Committee, supra note 47, at 4-5, J. App. 135-136
 
 
 [50]
 Comments of Growmark, Inc., supra note 35, at 3-8, J. App. 146-151; Comments of Ohio Rail Transportation Authority (filed Apr. 30, 1982) at 2-3, J. App. 75, 76-77; Comments of Patrick W. Simmons, supra note 47, at 7-8, J. App. 97-98. This contention has been persuasively rejected by the Commission, Railroad Consolidation Procedures, 363 I.C.C. 200 (1980), aff'd sub nom. Simmons v. ICC, No. 82-1495 (D.C.Cir. Feb. 23, 1983) (memorandum decision), and is not reasserted on the present review
 
 
 [51]
 See Comments of Growmark, Inc., supra note 35, at 11, J. App. 154; Supplement to Comments of Illinois Commerce Commission, supra note 47, at 2, J. App. 178; Comments of Kansas Department of Transportation (filed May 3, 1982) at 3, J. App. 165, 168; Comments of Montana Public Service Commission, supra note 47, at 4, J. App. 160
 
 
 [52]
 Notice problems were addressed in several different contexts. One was difficulty anticipated from the short spaces of time allowed for public comment on the proposed exemption and for responding to applications for exemptions in individual cases. See Comments of Mrs. Martin Alzheimer (filed Apr. 19, 1982), J. App. 25; Comments of Georgia Public Service Commission (filed Apr. 21, 1982) at 2, J. App. 21, 22; Comments of Minnesota Department of Transportation (filed Apr. 23, 1982), J. App. 27. Inadequacy of notice was also cited in connection with objections to the length of time--two years out of service--required before a line would qualify for the exemption. See Comments of Illinois and Illinois Commerce Commission, supra note 47, at 4-5, J. App. 123-124; Comments of New Hampshire Public Utilities Commission (filed Apr. 27, 1982) at 1-2, J. App. 43, 43-44. Commenters also indicated that notice of intent to abandon, provided through the railroad's amendments to its system diagram, was essential to the states' rail planning and support efforts. See Comments of Kansas Department of Transportation, supra note 51, at 4, J. App. 168; Comments of the Maryland State Railroad Administration (filed Apr. 28, 1982) at 2-4, J. App. 56, 58-60; Comments of Washington Department of Transportation, supra note 47, at 2, J. App. 46
 
 
 [53]
 See Comments of Patrick W. Simmons, supra note 47, at 2, J. App. 102; Comments of Washington Department of Transportation, supra note 47, at 1, J. App. 45
 
 
 [54]
 See Comments of Illinois and Illinois Commerce Commission, supra note 47, at 7, J.App. 126
 
 
 [55]
 Exemption of Out of Service Rail Lines, supra note 1
 
 
 [56]
 366 I.C.C. at 885, 891-892
 
 
 [57]
 Id. at 885. For example, the Commission expanded somewhat the much-criticized notice periods. Id. at 889; see also note 52 supra
 
 
 [58]
 Exemption of Out of Service Rail Lines, supra note 1, 366 I.C.C. at 887
 
 
 [59]
 Id
 
 
 [60]
 Id
 
 
 [61]
 Id
 
 
 [62]
 Black v. ICC, supra note 1, 246 U.S.App.D.C. at 23, 762 F.2d at 117; Brae Corp. v. ICC, 238 U.S.App.D.C. 352, 367, 740 F.2d 1023, 1038, cert. denied, --- U.S. ----, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985); Simmons v. ICC, 225 U.S.App.D.C. 84, 100, 697 F.2d 326, 342 (1982)
 
 
 [63]
 Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 41, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443, 466 (1983); Brae Corp. v. United States, supra note 62, 238 U.S.App.D.C. at 367, 740 F.2d at 1038
 
 
 [64]
 Brae Corp. v. United States, supra note 62, 238 U.S.App.D.C. at 367, 740 F.2d at 1038, quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207, 215 (1962)
 
 
 [65]
 In this part of our opinion, we consider whether the Commission satisfied the demand of Sec. 10505(a)(1) for dispensability of the forgone statutory provisions to effectuation of the rail transportation policy. In Part III, we examine the Commission's alternative holdings, responsive to Sec. 10505(a)(2), that the exempted transactions are of limited scope and that continued regulation is not needed to protect shippers from abuses of market power. In Part IV, we address petitioners' remaining contention that the Commission failed adequately to protect employee interests
 
 
 [66]
 49 U.S.C. Sec. 10505(a)(1) (1982)
 
 
 [67]
 Section 10101a provides:
 In regulating the railroad industry, it is the policy of the United States Government--
 (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;
 (2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;
 (3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission;
 (4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;
 (5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;
 (6) to maintain reasonable rates where there is an absence of effective competition and where rail rates provide revenues which exceed the amount necessary to maintain the rail system and to attract capital;
 (7) to reduce regulatory barriers to entry into and exit from the industry;
 (8) to operate transportation facilities and equipment without detriment to the public health and safety;
 (9) to cooperate with the States on transportation matters to ensure that intrastate regulatory jurisdiction is exercised in accordance with the standards established in this subtitle;
 (10) to encourage honest and efficient management of railroads and, in particular, the elimination of noncompensatory rates for rail transportation;
 (11) to require rail carriers, to the maximum extent practical, to rely on individual rate increases, and to limit the use of increases of general applicability;
 (12) to encourage fair wages and safe and suitable working conditions in the railroad industry;
 (13) to prohibit predatory pricing and practices, to avoid undue concentration of market power and to prohibit unlawful discrimination;
 (14) to ensure the availability of accurate cost information in regulatory proceedings, while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information; and
 (15) to encourage and promote energy conservation.
 49 U.S.C. Sec. 10101a (1982).
 
 
 [68]
 Coal Exporters Ass'n v. United States, 240 U.S.App.D.C. 256, 274 n. 22, 745 F.2d 76, 94 n. 22 (1984), cert. denied, --- U.S. ----, 105 S.Ct. 2151, 85 L.Ed.2d 507 (1985), quoting Alamo Express, Inc. v. ICC, 673 F.2d 852, 860 (5th Cir.1982)
 
 
 [69]
 See 49 U.S.C. Sec. 10505(a) (1982), quoted supra note 26
 
 
 [70]
 Black v. ICC, supra note 1, 246 U.S.App.D.C. at 23-24, 762 F.2d at 117-118; Coal Exporters Ass'n v. United States, supra note 68, 240 U.S.App.D.C. at 274 n. 22, 745 F.2d at 94 n. 22. We thus reject the argument of the Illinois petitioners, see Brief for Illinois Petitioners at 14-17; Reply Brief for Illinois Petitioners at 8, that the Commission was under a duty to explicate a treatment of each of the fifteen components of the rail transportation policy
 
 
 [71]
 Cf. Black v. ICC, supra note 1, 246 U.S.App.D.C. at 23, 762 F.2d at 117
 
 
 [72]
 See note 63 supra and accompanying text. Petitioner New York, while conceding that Sec. 10505(a)(1) does not require individual findings on each of the fifteen components of the rail transportation policy, asserts that the Commission must at minimum "show substantial compliance with some of them." Reply Brief for Petitioner New York at 12. We think the Commission's responsibility, both minimally and maximally, is to consider all aspects of the policy pertinent to the appropriateness of the exemption
 
 
 [73]
 See note 64 supra and accompanying text. While "the [Commission] need not explicitly discuss in its decision each factor enumerated," Coal Exporters Ass'n v. United States, supra note 68, 240 U.S.App.D.C. at 274 n. 22, 745 F.2d at 94 n. 22, quoting Alamo Express, Inc. v. ICC, supra note 68, 673 F.2d at 860; see also note 70 supra and accompanying text, it "is necessary that the essential basis of the [Commission's] rationale be clear enough so that a court can satisfy itself that the [Commission] has performed its function." Coal Exporters Ass'n v. United States, supra note 68, 240 U.S.App.D.C. at 274 n. 22, 745 F.2d at 94 n. 22, quoting Alamo Express, Inc. v. ICC, supra note 68, 673 F.2d at 860. See Brae Corp. v. United States, supra note 62, 238 U.S.App.D.C. at 367, 740 F.2d at 1038; see also Bowman Transp. v. Arkansas-Best Freight Sys., 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447, 456 (1974); Burlington Truck Lines v. United States, supra note 64, 371 U.S. at 168, 83 S.Ct. at 245, 9 L.Ed.2d at 215; American Trucking Ass'ns v. ICC, 656 F.2d 1115, 1125 (5th Cir.1981)
 
 
 [74]
 See Black v. ICC, supra note 1, 246 U.S.App.D.C. at 23, 762 F.2d at 117 (noting that the petitioner there had pointed to no unconsidered factor that might possibly have rendered the Commission's conclusion to grant an exemption arbitrary and capricious under the circumstances of that case)
 
 
 [75]
 Exemption of Out of Service Rail Lines, supra note 27, 47 Fed.Reg. at 13539
 
 
 [76]
 Id. (referring to 49 U.S.C. Sec. 10101a(2) (1982))
 
 
 [77]
 47 Fed.Reg. at 13538-13539 n. 1
 
 
 [78]
 Exemption of Out of Service Rail Lines, supra note 1, 366 I.C.C. at 891
 
 
 [79]
 Id. at 892 (referring to 49 U.S.C. Sec. 10101a(2) (1982)). Petitioner does not contest this finding
 
 
 [80]
 Id. (referring to 49 U.S.C. Sec. 10101a(7) (1982))
 
 
 [81]
 Id. (referring to 49 U.S.C. Sec. 10101a(15) (1982))
 
 
 [82]
 Brief for Illinois Petitioners at 17; Reply Brief for Petitioner New York at 12
 
 
 [83]
 Brief for Illinois Petitioners at 17
 
 
 [84]
 See 49 U.S.C. Sec. 10905 (1982); text supra at notes 16-23. In its decision, the Commission emphasized the inapplicability of this section to exempted abandonments. Exemption of Out of Service Rail Lines, supra note 1, 366 I.C.C. at 888
 
 
 [85]
 Brief for Petitioner New York at 13-15
 
 
 [86]
 See note 84 supra. Petitioner New York argues that elimination of the possibility of acquiring a rail line at a forced sale curtails opportunities for entry, and that this the Commission must balance against lowered barriers to exit. Brief for Petitioner New York at 14-15. The Commission emphasized that the opportunity for a free-market purchase of an abandoned line remains. Exemption of Out of Service Rail Lines, supra note 1, 366 I.C.C. at 888; see also Brief for Respondents at 15. Moreover, the Commission says, the purpose of the Sec. 10905 forced sale is to preserve existing service and, of course, there is no service to be continued when a line is out of use. Id. at 16
 
 
 [87]
 See, e.g., 49 U.S.C. Sec. 10101a(2) (1982). See also 49 U.S.C. Sec. 10101a note (4), (9) (congressional declaration of findings)
 
 
 [88]
 Brief for Illinois Petitioners at 17
 
 
 [89]
 Comments of Section on Energy and Environment, Interstate Commerce Commission (filed Apr. 1, 1982), J. App. 224. In its decision adopting the exemption, the Commission accepted this suggestion, noting that it lacks authority to exempt transactions from compliance with energy and environmental statutes, Exemption of Out of Service Rail Lines, supra note 1, 366 I.C.C. at 890, and stating that it may at times condition availability of the exemption on compliance with environmental criteria. Id. at 890. The Illinois petitioners argue that this statement reflects an impermissible limitation on what they claim to be the Commission's ability to deny altogether an exemption because of environmental considerations. Brief for Illinois Petitioners at 27-28. We find nothing in the Commission's statement warranting that construction
 
 
 [90]
 Indeed, at least one comment strongly criticized any finding to this effect as one without basis in fact or law. See Comments of State of Illinois and Illinois Commerce Commission, supra note 47, at 7, J. App. 126
 
 
 [91]
 American Trucking Ass'ns v. ICC, supra note 73, 656 F.2d at 1125; see also Bowman Transp. v. Arkansas-Best Freight Sys., supra note 73, 419 U.S. at 285, 95 S.Ct. at 442, 42 L.Ed.2d at 455-456
 
 
 [92]
 See note 73 supra
 
 
 [93]
 See notes 71-74 supra and accompanying text
 
 
 [94]
 Brief for Illinois Petitioners at 17
 
 
 [95]
 See 49 U.S.C. Sec. 10101a(6) (1982)
 
 
 [96]
 See Comments of Georgia Public Service Commission, supra note 52, at 1, J. App. 21 (arguing that because rate structures are based on mileage, exemption will result in higher rates because of more circuitous routes); Comments of Montana Citizens Freight Rate Association, supra note 47, J. App. 13 (requesting that exemption not apply to situations where through rates will be disrupted); Comments of North Carolina Utilities Commission (filed May 4, 1982), J. App. 42 (anticipating that where rail rates are based on short-line mileage, abandonment of certain lines may result in higher rates)
 
 
 [97]
 Brief for Respondents at 17
 
 
 [98]
 See Illinois v. United States, 666 F.2d 1066, 1080 (7th Cir.1981) (Commission must consider whether shippers relegated to alternative transportation can remain competitive); Georgia Pub. Serv. Comm'n v. United States, 704 F.2d 538, 545 (11th Cir.1983) (in abandonment case, Commission must consider whether alternative transportation is economically feasible)
 
 
 [99]
 Illinois petitioners assert that the effect the exemption has on rates also brings into play Sec. 10101a(1), (3), (10), and (11) of the rail transportation policy. Brief for Illinois Petitioners at 17
 
 
 [100]
 This conclusion accords closely with our holding in Brae Corp. v. United States, supra note 62, 238 U.S.App.D.C. at 375-376, 740 F.2d at 1046-1047, that the Staggers Act's requirement that the Commission consider the need for continued regulation to further the rail transportation policy mandates study of the relationship between the statutory provisions ordinarily applicable and relevant facets of that policy. Like the statutory sections addressed in Brae, those concerning abandonment were revised by Congress "at approximately the same time and as part of the same Act which contains both the transportation policy in Sec. 10101a and the exemption authorization in Sec. 10505a." Id. at 376, 740 F.2d at 1047
 
 
 [101]
 See 49 U.S.C. Sec. 10101a(4) (1982)
 
 
 [102]
 For example, the Department of Defense submitted comments on the exemption's implications for the national defense, asserting that advance notice of a railroad's intention to abandon a line, required by Sec. 10904(e)(2), (3), is essential if the Department is to perform the task of estimating potential impacts of abandonments and taking steps to retain necessary rail capability. Comments of United States Department of Defense (filed Apr. 30, 1982) at 3, J.App. 65. The Department stated that it has a limited number of installations in standby or semi-active status that may not have used rail service for two or more years, but might require rail capability in a prolonged wartime effort. Id. at 4, J. App. 66. The Department suggested that "the exemption should provide for identification on the rail carrier's system diagram map for a four-month period prior to the line's being abandoned." Id. The Department also expressed the view that "the Commission should consider a shipper's request for implementation of financial assistance procedures as adequate justification for granting a petition for revocation." Id. at 5, J. App. 67. The Department expressly invoked the terms of Sec. 10101a(4), id. at 1, J. App. 63, as did the Railroad Labor Executives' Association. Comments of Railroad Labor Executives' Association (filed Apr. 30, 1982) at 3, J. App. 112, 114. Subsequently, the exemption was amended to provide the Department of Defense with additional notice of intent to abandon, but the Department's remaining concerns and suggestions were not addressed. See Exemption of Out of Service Rail Lines; Notice to the Department of Defense, 50 Fed.Reg. 24649 (1985)
 
 
 [103]
 Brief for Respondents at 18. The Commission characterizes the Department of Defense's plea as one for "adequate opportunity to purchase abandoned rail lines that may be needed for national defense purposes." Brief for Respondents at 18. However, the Department's comments refer not only to the subsidiary issue of potential rescue of a to-be-abandoned line, but primarily to a need for "reasonable advance notice of potential abandonments ... in order to have sufficient time to evaluate impact." Comments of United States Department of Defense, supra note 102, J. App. 63; see generally note 102 supra
 
 
 [104]
 Brief for Respondents at 18
 
 
 [105]
 Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., supra note 63, 463 U.S. at 50, 103 S.Ct. at 2780, 77 L.Ed.2d at 462; Brae Corp. v. United States, supra note 62, 238 U.S.App.D.C. at 376, 740 F.2d at 1047
 
 
 [106]
 See notes 102-103 supra
 
 
 [107]
 See note 14 supra and accompanying text
 
 
 [108]
 See note 16 supra and accompanying text
 
 
 [109]
 See 49 U.S.C. Sec. 10101a(9) (1982)
 
 
 [110]
 Brief for Respondents at 18. The Commission claims that the policy fostering cooperation with the states is intended only to assure that states will adhere to the rail transportation policy when they regulate intrastate transportation provided by carriers subject to Commission jurisdiction because of their interstate operation. Id. See 49 U.S.C. Sec. 11501(b) (1982). The Commission also contends that the purpose of the system diagram is to warn states in advance that lines considered burdensome by the carrier may become candidates for abandonment if greater traffic and revenue commitments are made, id. at 17, and that "[s]uch advance warning would not seem to be particularly necessary for out-of-service lines." Id. at 17-18
 
 
 [111]
 See Brief for Respondents at 18
 
 
 [112]
 See 49 U.S.C. Sec. 10101a(9) (1982)
 
 
 [113]
 See Comments of Delaware Department of Transportation (filed Apr. 21, 1982), J. App. 12; Comments of Georgia Public Service Commission, supra note 52, J. App. 21-22; Comments of Kansas Department of Transportation, supra note 51, at 4, J. App. 169; Comments of Maryland State Railroad Administration, supra note 52, at 4, J. App. 60; Comments of North Carolina Utilities Commission, supra note 96, J. App. 42; Comments of Commonwealth of Virginia (filed Apr. 14, 1982), J. App. 9
 
 
 [114]
 See text supra at note 89
 
 
 [115]
 See text supra at notes 95-113
 
 
 [116]
 49 U.S.C. Sec. 10505(a)(2)(A) (1982), quoted supra note 26
 
 
 [117]
 Id. Sec. 10505(a)(2)(B), quoted supra note 26
 
 
 [118]
 Exemption of Out of Service Rail Lines, supra note 1, 366 I.C.C. at 892
 
 
 [119]
 Id
 
 
 [120]
 Of course, a showing that the exemption might not protect against abuses of market power would not preclude exemption if the Commission could properly find that the exemption transaction is of limited scope
 
 
 [121]
 See note 58 supra and accompanying text
 
 
 [122]
 Brief for Illinois Petitioners at 20-21. The question of subterfuge relates closely to the aspects of the rail transportation policy specified in 49 U.S.C. Sec. 10101a(4), (6), (10) (1982), quoted supra note 67
 
 
 [123]
 Exemption of Out of Service Rail Lines, supra note 27, 47 Fed.Reg. 13538-13539. See also note 127 infra
 
 
 [124]
 Exemption of Out of Service Rail Lines, supra note 27, 47 Fed.Reg. at 13539
 
 
 [125]
 Id
 
 
 [126]
 Brief for Illinois Petitioners at 19-20
 
 
 [127]
 As we have mentioned, see notes 28-29 supra, in these decisions the Commission had granted exemptions enabling abandonments of lines that had lain out of service for from ten to twenty-four years. Furthermore, in one of these decisions, the Commission based its finding of limited scope on the fact that the unused track segment was at the end of a branch line, Atchinson, T. & S.F. Ry., supra note 29, J. App. 106; in another, the Commission premised its finding of limited scope not only on an eleven-year absence of traffic on the line but also on the ground that it was only a short-line segment for which no need existed, with the result that no shippers would be adversely affected by its abandonment, Burlington N. R.R., supra note 29, J. App. 110; and in still another of the decisions, the Commission's finding of limited scope rested not only on the fact that the line had not handled any traffic for twenty-four years but also on the fact that the abandonment was limited to a short-line segment. Louisville & N. R.R., supra note 29, J. App. 108
 
 
 [128]
 Brief for Illinois Petitioners at 20
 
 
 [129]
 See Exemption of Out of Service Rail Lines, supra note 1, 366 I.C.C. at 886 n. 4. The exempted line had not been used for a year and a half and the Commission granted the exemption less than a month before it issued its notice of rulemaking in this case. Id
 
 
 [130]
 Id. The Illinois petitioners assert that the grants of these three exemptions were self-serving because they post-dated proposal of the two-year rule. Brief for Illinois Petitioners at 20
 
 
 [131]
 See 49 U.S.C. Sec. 11702(a)(1) (1982) (empowering the Commission to bring civil injunction suits against railroads allegedly violating Secs. 10901-10907)
 
 
 [132]
 Exemption of Out of Service Rail Lines, supra note 1, 366 I.C.C. at 888. See 49 C.F.R. pt. 1111 (1985) (complaint and investigative procedures). The railroad seeking the exemption must certify that no shipper has filed such a complaint within the two-year period. 49 C.F.R. Sec. 1152.50(b) (1985)
 
 
 [133]
 See 49 C.F.R. Sec. 1110.10 (1985)
 
 
 [134]
 Exemption of Out of Service Rail Lines (Dec. 27, 1983) (decision on reconsideration) at 3
 
 
 [135]
 Exemption of Out of Service Rail Lines, supra note 58, 50 Fed.Reg. at 8335; see note 48 supra
 
 
 [136]
 See H.R.Rep. No. 1430 (Conf.), 96th Cong., 2d Sess. 105 (1980), U.S.Code Cong. & Admin.News 1980, p. 3978 (articulating Conference Committee's expectation that Commission will adopt policy of reviewing carrier actions after the fact to correct abuses of market power)
 
 
 [137]
 See FCC v. WNCN Listeners Guild, 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521, 535 (1981); Telelocator Network v. FCC, 223 U.S.App.D.C. 336, 349, 691 F.2d 525, 538 (1982); Shell Oil Co. v. FPC, 520 F.2d 1061, 1071 (5th Cir.1975), cert. denied, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976)
 
 
 [138]
 The notice of rulemaking had specifically requested comments on this potential change, Exemption of Out of Service Rail Lines, supra note 27, 47 Fed.Reg. at 13539, which shippers had vigorously opposed. See Comments of Growmark, Inc., supra note 35, at 11, J. App. 154; Supplement to Comments of Illinois Commerce Commission, supra note 47, at 2, J. App. 178; Comments of Kansas Department of Transportation, supra note 51, at 3, J. App. 168; Comments of Montana Public Service Commission, supra note 47, at 4, J. App. 160
 
 
 [139]
 See Exemption of Out of Service Rail Lines, supra note 27, 47 Fed.Reg. at 13539
 
 
 [140]
 Exemption of Out of Service Rail Lines, supra note 1, 366 I.C.C. at 892
 
 
 [141]
 Id. at 885
 
 
 [142]
 Id. at 887
 
 
 [143]
 See text supra at notes 116-117
 
 
 [144]
 See Comments of Growmark, Inc., supra note 35, at 11, J. App. 154; Comments of Montana Public Service Commission, supra note 47, at 4, J. App. 160
 
 
 [145]
 See Part III(A) supra
 
 
 [146]
 See Brae Corp. v. United States, supra note 62, 238 U.S.App.D.C. at 367, 740 F.2d at 1038; American Trucking Ass'ns v. ICC, supra note 73, 656 F.2d at 1125; see also Bowman Transp. v. Arkansas-Best Freight Sys., supra note 73, 419 U.S. at 285, 95 S.Ct. at 442, 42 L.Ed.2d at 455-456
 
 
 [147]
 49 U.S.C. Sec. 10505(g) (1982), quoted supra note 26
 
 
 [148]
 See 49 C.F.R. Sec. 1152.50(d)(2) (1985)
 
 
 [149]
 360 I.C.C. 91, 93-96, 98-103 (1979)
 
 
 [150]
 Exemption of Out of Service Rail Lines, supra note 27, 47 Fed.Reg. at 13540 (1982)
 
 
 [151]
 Exemption of Out of Service Rail Lines, supra note 1, 366 I.C.C. at 885
 
 
 [152]
 See Railway Labor Executives' Ass'n v. United States, 219 U.S.App.D.C. 23, 31, 675 F.2d 1248, 1256 (1982)
 
 
 [153]
 Brief for Illinois Petitioners at 26; Reply Brief for Illinois Petitioners at 10
 
 
 [154]
 Brief for Illinois Petitioners at 26-27
 
 
 [155]
 The regulation spawning this dispute provides in relevant part:
 Petitions to stay the effective date of the exemption must be filed within 10 days after publication and petitions for reconsideration must be filed within 20 days after publication. The exemption will be effective 30 days after publication (unless stayed pending reconsideration). If the notice of exemption contains false or misleading information, the use of the exemption is void ab initio and the Commission shall summarily reject the exemption notice.
 
 
 [49]
 C.F.R. Sec. 1152.50(d)(3) (1985). The Illinois petitioners claim that a petition for reconsideration is available under this regulation only when a railroad is alleged to have incorporated false or misleading information into its notice of exemption, Reply Brief for Illinois Petitioners at 4-5, and contend that labor therefore must rely on revocation procedures. Brief for Illinois Petitioners at 27. The Commission has changed its position on this issue several times in the interim between its decision and submission of this case for decision by this court. Initially, the Commission indicated that availability of petitions for reconsideration would make petitions for revocation unnecessary. Exemption of Out of Service Rail Lines, supra note 1, 366 I.C.C. at 890. When petitioners sought to reopen the proceeding, however, the Commission stated that reconsideration and revocation procedures would be appropriate. Exemption of Out of Service Rail Lines, supra note 134, at 2. The Commission's brief informed us that a petition for reconsideration would command Commission examination of the protection issue, Brief for Respondents at 23, but at oral argument Commission counsel took the position that a petition for reconsideration can be utilized only if the Commission finds that certification of the abandonment was improper--presumably because the factual predicates are absent
 
 
 [156]
 See note 155 supra
 
 
 [157]
 We may, however, dispose of one argument. The Illinois petitioners assert that relegation of the issue of adequacy of employee protections to post-abandonment revocation procedures would violate an administrative rule that the Commission must establish the level of employee protection before consummation of an abandonment. Reply Brief for Illinois Petitioners at 10. The case cited for this proposition does not, however, impose any requirement that consideration of this problem precede actual abandonment. See Railway Labor Executives' Ass'n v. United States, supra note 152, 219 U.S.App.D.C. at 31, 675 F.2d at 1256